James I. BERRY; James Varano; Gregg M. Weiss; Gregg M. Ira, f/b/o Weiss; Peter Garuccio, M.D.; P.C. Pension Plan; Frederick Jewett; Milburn E. Estes; Joseph P. Yonke; Investar Partnership; Eugene Honeyman; Anne Kantor; Murray Goldsmith; Morton Surkin; Florence Surkin; Robert Leimsider; Gilbert

Bergelson, on behalf of themselves and all others similarly situated, Plaintiffs–Appellants,

v.

VALENCE TECHNOLOGY, INC.; Lev Dawson; Calvin L. Reed; Cristine A. Russell; Dale R. Shackle; David M. Butze; William J. Masuda; Carl E. Berg; Alan F. Shugart; Bert C. Roberts, Defendants–Appellees.

No. 97–17346.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 9, 1998.

Filed April 29, 1999.

Patrick J. Coughlin, Eric A. Isaacson, James A. Caputo, Randi D. Bandman, Henry Rosen, Joseph D. Daley, Leonard B. Simon, Milberg Weiss Bershad Hynes & Lerach, LLP, San Diego, California, Joseph J. Tabacco, Jr., Christopher T. Heffelfinger, Berman, DeValerio, Pease & Tabacco, San Francisco, California, for the plaintiffs-appellants.

Robert P. Feldman, Wilson Sonsini Goodrich & Rosati, Palo Alto, California, for defendants-appellees Valence Technology, Inc., Calvin L. Reed, Dale R. Shackle, and Carl E. Berg.

Tower C. Snow, Jr., Brobeck, Phleger & Harrison, San Francisco, California, for defendant-appellee Lev M. Dawson.

Before: BRIGHT,* FLETCHER, and THOMPSON, Circuit Judges.

FLETCHER, Circuit Judge:

Plaintiffs, a class of persons who purchased stock in Valence Technology, Inc. (Valence) within a specified 27-month period, sued Valence and several of its officers for securities fraud in violation of section 10(b) of the Securities and Exchange Act of 1934. The district court granted Va-

---

* The Honorable Myron H. Bright, Senior United States Circuit Judge for the Eighth Circuit, sitting by designation.

lence's motion for summary judgment, holding that Plaintiffs' claims were barred by the statute of limitations because Plaintiffs were on "inquiry notice" of the possibility of fraud more than one year before they filed suit. On appeal, Plaintiffs argue that "actual discovery," not inquiry notice, triggers the statute of limitations for claims under section 10(b). Alternatively, Plaintiffs contend the district court erred in holding that an article in the March, 1993 issue of *Forbes* magazine sufficed to put them on inquiry notice. Plaintiffs also appeal from the district court's earlier dismissal under Rule 12(b)(6) of claims against Valence's former CEO Lev Dawson for alleged fraud occurring after Dawson's resignation as CEO. We have jurisdiction pursuant to 28 U.S.C. § 1291. We reverse the district court's grant of summary judgment on the statute of limitations issue, and affirm its dismissal of the claims against Dawson.

## I.

Plaintiffs brought this case as a securities class action on behalf of all persons who purchased stock in Valence between May 7, 1992 and August 10, 1994. Defendants include Valence, Lev Dawson (Valence's founder and first CEO), Calvin Reed (Valence's CEO between 1993 and 1997), Dale Shackle (a scientist and former Valence officer), and Carl Berg (a member of Valence's Board of Directors).[1] Plaintiffs allege that Valence violated section 10(b) of the Securities and Exchange Act of 1934 (the 1934 Act), *see* 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, *see* 17 C.F.R. § 240.10b–5.[2]

Valence was founded in 1989 to develop new battery technology. In May, 1992, after announcing that it was developing a new solid electrolyte rechargeable battery, Valence raised $33 million in an initial public offering of its stock. Valence stated that "[u]nlike the liquid electrolyte used in most batteries, the Company's electrolyte is a solid, which reduces weight, volume and safety problems." Valence also claimed that its solid electrolyte batteries were much more powerful for their size, having an "energy density" "significantly exceeding that of batteries currently in use." Moreover, Valence advertised its batteries as having an extended life cycle, with the capacity to be recharged many more times than conventional rechargeable batteries. Valence announced that it was focusing in particular on applying this technology to the commercial manufacture of batteries for use in cellular telephones and laptop computers. In November, 1992, Valence raised $82.8 million in a second public offering. In December, 1992, Valence announced the conclusion of a $100 million contract with Motorola, which was to begin using Valence's batteries in its cellular telephones in 1994.

On February 15, 1993, the March issue of *Forbes* magazine published an article about Valence entitled "Story Stock." Although press coverage of Valence had been quite positive up until then, the *Forbes* article was more skeptical. The headline of the article asked: "What levitates technology companies on Wall Street? Look at the case of Valence Technology and the curious merry-go-round of insiders, underwriters and journalists that keeps its stock spinning." The article claimed that while "the folks at Valence can put on a good show" in demonstrating prototypes of their battery, the investment community remained largely ignorant to "what is really energizing this stock":

> [A] triad that includes insiders unloading shares for a price hundreds of times what they paid, an underwriting firm

---

**1.** Except when distinguishing among the individual defendants, we use "Valence" to refer to all defendants collectively.

**2.** Plaintiffs further allege that Dawson, Reed, and Berg violated section 20(a) of the 1934 Act, *see* 15 U.S.C. § 78t(a). That section provides for joint and several liability for persons controlling persons or entities liable elsewhere under the 1934 Act.

that pulls in fees for helping them do that, and journalists who are only too willing to take at face value the boastful pronouncements of the company's publicity department.

Thus, although Valence's battery "works beautifully in the lab," "[t]he world doesn't know" whether it will "last" or if it can be "made cheaply."

The article took particular aim at Carl Berg, Valence's largest shareholder. It noted his participation in two other Silicon Valley enterprises through which he made large profits even though the companies themselves suffered financially. "The pattern," according to the article, "seems to be [that] ... [o]utside investors may do poorly, but Berg usually gets his money out."

Valence and its officers made several public pronouncements in response to the *Forbes* article. Lev Dawson, then the CEO of Valence, sent a letter to *Forbes* that Valence distributed to shareholders, describing the article as "inaccurate." Dawson maintained that Valence's contract with Motorola was a "basic purchase agreement" and not "less than meets the eye" as the *Forbes* article claimed. Dawson further noted that General Motors' Delco–Remy division "researched our technology prior to entering into a $20 million research and development contract for the development of batteries."

There was a modest press follow-up to the *Forbes* article. The *San Francisco Chronicle* published a story on February 27, 1993, reiterating the *Forbes* article's claim that "there was no reliable evidence that the batteries will work as advertised." *Bloomberg Business News,* in contrast, reported Dawson's response to the *Forbes* article in a February 17, 1993 wire story entitled "Valence Chairman Calls *Forbes* Article 'Inaccurate'." Later press coverage resumed its largely positive tone: September, 1993 stories in *Dow Jones Wire Service* and *The Wall Street Journal* reported Valence's announcement that it would deliver the batteries for the Motoro-

la contract in the coming year. Neither story mentioned the *Forbes* article.

The week after the *Forbes* article was released, Valence's stock dropped from about $15.00 per share to $12.50 per share on February 23, 1993. It rose back to $15.00 on February 25, however. After fluctuating between $17.75 and $11.50 from early March into September, by September 28 the stock reached $20.00. In December, 1993, Valence completed its third public offering, raising $51.5 million.

On May 3, 1994, Valence announced that it was unable to meet Motorola's specifications, and that it would not be delivering batteries under that contract as planned. On that day, Valence's stock dropped from $9.50 to $5.25. On June 16, 1994, Valence announced that it could not meet Hewlett–Packard's specifications. Valence's stock dropped from $6 to $3.813 on that day. On August 9, 1994, Valence announced that it was abandoning its new battery technology. Valence's stock then dropped from $4.375 to $3.375.

Plaintiffs filed suit on May 3, 1994. After consolidating subsequent complaints and certifying the class, the district court dismissed several of Plaintiffs' claims on Rule 12(b)(6) motions from Valence. In particular, the district court dismissed claims against Dawson relating to alleged misrepresentations made after he stepped down as CEO of Valence on April 30, 1993. Valence subsequently moved for summary judgment. The Special Master to whom the district court had referred the motion recommended granting summary judgment on statute of limitations grounds. The district court adopted that recommendation on November 6, 1997. *See In re Valence Tech., Inc. Sec. Litig.,* 987 F.Supp. 796 (N.D.Cal.1997). This appeal timely followed.

II.

In granting Valence's motion for summary judgment on statute of limitations grounds, the district court held that for

actions under section 10(b) of the 1934 Act, the statute of limitations begins to run with the disclosure of "facts that would have caused a reasonable person to suspect the possibility of a misrepresentation or misleading omission." *See In re Valence*, 987 F.Supp. at 801 (quoting *LaSalle v. Medco Research, Inc.*, 54 F.3d 443, 444 (7th Cir.1995)). This standard is a version of "inquiry notice." Plaintiffs contend that the correct standard is one of actual discovery.

■ We review a district court's grant of summary judgment de novo. *See Margolis v. Ryan*, 140 F.3d 850, 852 (9th Cir. 1998). Viewing the evidence in the light most favorable to the nonmoving party and drawing all reasonable inferences in its favor, we ask (1) whether the district court correctly applied the relevant law, and (2) whether there are any genuine issues of material fact. *See id.*

■ Private causes of action under section 10(b) of the 1934 Act and Rule 10b–5 promulgated thereunder are of judicial creation. *See, e.g., Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 730, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). Consequently, such actions have no statutorily-specified limitations period. However, in *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991), the Supreme Court held that the standard contained in section 9(e) of the 1934 Act applies also to actions under section 10(b). Thus, "[l]itigation instituted pursuant to § 10(b) and Rule 10b–5 must be commenced within one year after the discovery of the facts constituting the violation and within three years after such violation." *Id.* at 364, 111 S.Ct. 2773.[3]

Plaintiffs contend that *Lampf* established an actual discovery standard for triggering the statute of limitations. *Lampf* does appear unequivocal on this point: "The 1–year period, by its terms, begins after *discovery* of the facts constituting the violation." 501 U.S. at 363, 111 S.Ct. 2773 (emphasis added).[4] Moreover, in applying section 9(e)'s limitations period to actions under section 10(b), *Lampf* explicitly chose a provision requiring actual discovery over other provisions allowing inquiry notice. In contrast to section 9(e), section 13 of the Securities and Exchange Act of 1933 (the 1933 Act) stipulates that actions under that Act must be brought "within one year after the discovery of the untrue statement or the omission, *or after such discovery should have been made by the exercise of reasonable diligence.*" 15 U.S.C. § 77m (emphasis added). The Supreme Court in *Lampf* acknowledged the difference, and was clear about its choice: "[T]he various 1–and–3–year periods contained in the 1934 and 1933 Acts differ slightly in terminology. To the extent that these distinctions in the future might prove significant, we select as the governing standard for an action under § 10(b) the language of § 9(e) of the 1934 Act." 501 U.S. at 364 n. 9, 111 S.Ct. 2773.

We have not previously identified the correct standard in light of *Lampf*.[5] How-

---

**3.** Section 9(e) provides, in pertinent part: "No action shall be maintained to enforce any liability created under this section, unless brought within one year after the discovery of the facts constituting the violation and within three years after such violation." 15 U.S.C. § 78i(e).

**4.** An actual discovery standard does not require determining precisely when each plaintiff actually knew of facts sufficient to make out a claim of fraud. Courts can impute knowledge of public information without inquiring into when, or whether, individual shareholders actually knew of the information

in question. *See Whirlpool Fin. Corp. v. GN Holdings, Inc.*, 67 F.3d 605, 610 (7th Cir. 1995) ("A reasonable investor is presumed to have information available in the public domain, and therefore ... is imputed with constructive knowledge of this information.").

**5.** Valence claims otherwise, citing *In re Stac Elec. Sec. Litig.*, 89 F.3d 1399 (9th Cir.1996), *cert. denied sub nom. Anderson v. Clow*, 520 U.S. 1103, 117 S.Ct. 1105, 137 L.Ed.2d 308 (1997). *Stac* applied *Lampf* to a case involving section 10(b) claims and affirmed the dismissal of several defendants added to a suit over one year after it was first filed. *Stac*

ever, every circuit to have addressed the issue since *Lampf* has held that inquiry notice is the appropriate standard. *See, e.g., Sterlin v. Biomune Sys.*, 154 F.3d 1191, 1201 (10th Cir.1998); *Great Rivers Co-op of S.E. Iowa v. Farmland Indus., Inc.*, 120 F.3d 893, 896–97 (8th Cir.1997); *Ockerman v. May Zima & Co.*, 27 F.3d 1151, 1155 (6th Cir.1994); *Tregenza v. Great American Comm. Co.*, 12 F.3d 717, 718 (7th Cir.1993); *Menowitz v. Brown*, 991 F.2d 36, 41–42 (2d Cir.1993); *Howard v. Haddad*, 962 F.2d 328, 329–30 (4th Cir. 1992); *Topalian v. Ehrman*, 954 F.2d 1125, 1134–35 (5th Cir.1992). On a literal reading of *Lampf*, those decisions appear to be "contrary to the specific guidance issued by the Court." *Slavin v. Morgan Stanley & Co.*, 791 F.Supp. 327 (D.Mass. 1992); *see generally* Lewis D. Lowenfels & Alan R. Bromberg, *SEC Rule 10b–5 and Its New Statute of Limitations: The Circuits Defy the Supreme Court*, 51 BUS. LAW. 309 (1996).[6]

If we were to adopt inquiry notice, we would agree with the Tenth Circuit's formulation of that standard. In *Sterlin*, the Tenth Circuit surveyed case law from oth-er circuits and found that most circuits "generally apply an inquiry notice standard coupled with some form of reasonable diligence requirement." *Id.* at 1199–1200. In *Sterlin*'s formulation, "inquiry notice ... triggers an investor's duty to exercise reasonable diligence and ... the one-year statute of limitations period begins to run once the investor, in the exercise of reasonable diligence, should have discovered the facts underlying the alleged fraud." 154 F.3d at 1201. Were we to apply the *Sterlin* test to this case, we would face two questions. First, did the *Forbes* article raise sufficient suspicion of fraud to cause a reasonable investor to investigate the matter further? Second, when should a reasonably diligent investor have discovered the facts underlying the alleged fraudulent activity? If the answer to the first question were yes, the answer to the second question would determine when the statute of limitations began to run.

In this case, we need not decide whether actual discovery or inquiry notice applies, because under either standard the *Forbes* article did not trigger the statute of limitations.[7] First, we note that the

held that the statute of limitations began running with the original filing, because "plaintiffs were clearly aware of or suspected fraud at the time they filed their first complaint." 89 F.3d at 1411. In that case, therefore, the event triggering the statute of limitations was plaintiffs' filing of their complaint alleging specific acts of fraud. That filing would have sufficed under either an inquiry notice or an actual discovery standard. *Stac* did not specifically address which of the two standards applied. In fact, the *Stac* panel withdrew its original opinion in order to delete a passage stating that inquiry notice applies to actions under section 10(b). *See In re Stac Elec. Sec. Litig.*, 82 F.3d 1480, 1492 (9th Cir.), *amended by* 89 F.3d 1399 (9th Cir.1996). Thus, *Stac* did not hold that inquiry notice is the standard. *See City Nominees Ltd. v. Macromedia, Inc.*, 1998 WL 267964, *1 (N.D.Cal. May 18, 1998) (noting that *Stac* "implies that inquiry notice should be used," but recognizing that "[t]here is no Ninth Circuit case on point.").

6. Several circuits, most notably the seventh circuit in *Tregenza*, seem to justify inquiry notice on policy grounds. *See Tregenza*, 12 F.3d at 722. To the extent policy considerations are relevant here, however, it is far from clear that inquiry notice is the more desirable standard. First, Inquiry Notice Is Not Amenable To Bright Line Rules. What information raises sufficient "red flags" to put shareholders on inquiry notice is, as the author of *Tregenza* has apparently recognized, not answerable as a per se matter. *See Fujisawa Pharm. Co., Ltd. v. Kapoor*, 115 F.3d 1332, 1334–37 (7th Cir.1997) (Posner, C.J.). Second, adopting inquiry notice risks causing considerable confusion among shareholders. Indeed, triggering the statute of limitations on inquiry notice may force shareholders to choose between "risking what may be a frivolous suit filed timely on skimpy facts, and spending time investigating further on the chance that the short fuse may be running and later bar a legitimate action." Charles Benjamin Nutley, *Triggering One-Year Limitations on Section 10(b) and Rule 10b–5 Actions: Actual or Inquiry Discovery?* 30 San Diego L. Rev. 917, 948 (1993).

7. It is undisputed that if actual discovery is the appropriate standard, the *Forbes* article did not trigger the statute of limitations.

*Forbes* article made no allegation of actual fraud on the part of Valence or its principals. While an investor need not have full knowledge of fraud in order reasonably to be expected to investigate worrisome allegations concerning his investments, he will not be presumed to have done so unless the allegations are sufficient to "excite inquiry" into the possibility of fraudulent conduct. *Sterlin*, 154 F.3d at 1203 (quoting *Cook v. Avien*, 573 F.2d 685, 697 n. 25 (1st Cir.1978)); *see Beneficial Standard Life Ins. Co. v. Madariaga*, 851 F.2d 271, 275 (9th Cir.1988) (allegations must be substantial enough to "warrant inquiry"). A press article's general skepticism about a company's future prospects is not sufficient to excite inquiry into the specific possibility of fraud. Rather, in order for a press article to put shareholders on inquiry notice, there must be some reasonable nexus between the allegations made in the article and the nature of the action subsequently brought. *See* 15 U.S.C. § 78i(e) (statute of limitations is triggered with "discovery of the *facts constituting the violation*") (emphasis added); *Gray v. First Winthrop Corp.*, 82 F.3d 877, 881 (9th Cir.1996) ("The limitations period commences when the plaintiff 'has actual or inquiry notice that a *fraudulent misrepresentation* has been made.'") (quoting *Volk v. D.A. Davidson & Co.*, 816 F.2d 1406, 1412 (9th Cir.1987)) (emphasis added). In the context of section 10(b) actions, shareholders are on inquiry when they learn that a representation made by the company is "false for reasons likely to have been within the knowledge of the company when making it." *Law v. Medco Research*, 113 F.3d 781, 785 (7th Cir.1997).

In this case, the *Forbes* article essentially raised questions about the ultimate viability of Valence's product, questions that even the article claimed were largely unanswerable. "Valence Technology's lithium/polymer battery works beautifully in the lab," the article noted, "But will it last? Can it be made cheaply? *The world doesn't know*." (emphasis added). The article's conclusion that "investors ought to be a little choosier" before buying stock in Valence suggested simply that Valence's technology remained unproven. While perhaps warranting caution before investing, such a suggestion certainly does not excite inquiry into the possibility of fraud. Indeed, the article's most provocative claim—that a "curious merry-go-round of insiders, underwriters and journalists ... keeps [Valence's] stock spinning"—challenged the enthusiasm and hype heaped on the product by the industry, not the honesty or good faith of Valence's leaders.[8]

The negligible impact of the *Forbes* article bolsters our conclusion. First, the market exhibited little reaction to the article. Although Valence's stock did dip from $15.00 to $12.50 about ten days after the article was published, two days later it rebounded to $15.00. Six months later, the stock reached $20.00. Two months after that, Valence raised over $50 million in a third public offering. Since the market did not react adversely to the *Forbes* article, a reasonable investor can hardly be expected to have suspected fraud. *Compare Law*, 113 F.3d at 784 (noting

---

8. In this respect, the *Forbes* article stands in stark contrast to the *Barron's* article in *Sterlin*, 154 F.3d at 1202–04. The *Barron's* article implied that the company at issue, Biomune, had lied in its SEC filings. According to the *Barron's* article, Biomune claimed in its SEC filings that Jack Solomon, an investor who had previously faced SEC charges, owned no Biomune stock. The article pointed out, however, that a "byzantine array of entities in one way or another affiliated with Solomon own more than 35% of [Biomune's] stock." *Id.* at 1203. The article thus alleged facts sufficient for a reasonable investor to conclude that Biomune had attempted to hide Solomon's interest in the company in order to survive SEC scrutiny. The *Forbes* article in this case contained no such allegations. While the article noted the checkered past of Carl Berg, one of Valence's principal investors, it did not state any facts from which it could be inferred that Valence was trying to mislead market regulators or defraud investors by hiding Berg's involvement in the company.

that the market did not respond to a series of skeptical articles, and concluding that the articles did not put shareholders on inquiry notice), *with Sterlin,* 154 F.3d at 1204 (noting that stock price "suffered a slide" after publication of skeptical *Barron's* article putting investors on inquiry notice). Second, other press coverage of Valence remained largely positive. Indeed, in September, 1993, both *Dow Jones Wire Service* and *The Wall Street Journal* ran positive stories on Valence without even mentioning the *Forbes* article. Third, Lev Dawson responded publicly to the article immediately after it was published, refuting its allegations and claiming that Valence was everything it purported to be. It is true that a "dear shareholder" letter alone is insufficient to dissipate "storm clouds" over a company once they have gathered. *See Sterlin,* 154 F.3d at 1204; *Great Rivers Coop.,* 120 F.3d at 898. But given the lack of any notable adverse market reaction or negative press follow-up, it would have been reasonable for a shareholder to read Dawson's letter and to conclude that nothing was amiss.

We hold, therefore, that the *Forbes* article would not have led a reasonable investor to investigate the possibility of fraud. Accordingly, regardless of whether we adopt actual discovery or inquiry notice as the governing standard, we find that the statute of limitations had not run when Plaintiffs filed their suit.[9]

### III.

Over sixteen months before it granted Valence's motion for summary judgment, the district court dismissed all claims against Dawson "to the extent that they are based on alleged misstatements after April 30, 1993." The district court dismissed those claims for failure to state a claim upon which relief can be granted, *see*

FED. R. CIV. P. 12(b)(6), stemming from failure to satisfy the requirements of "group pleading," *see* FED. R. CIV. P. 9(b), as set out in *In re GlenFed Sec. Litig.,* 60 F.3d 591, 593 (9th Cir.1995). Plaintiffs contend that the dismissal was error.

■ We review de novo dismissals for failure to state a claim. *See Steckman v. Hart Brewing, Inc.,* 143 F.3d 1293, 1295 (9th Cir.1998). In so doing, we treat the allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *See Warshaw v. Xoma Corp.,* 74 F.3d 955, 957 (9th Cir.1996).

Rule 9(b) of the Federal Rules of Civil Procedure provides that "[i]n all averments of fraud ..., the circumstances constituting fraud ... shall be stated with particularity." In *GlenFed,* this court noted that in securities fraud cases, "[a] plaintiff may satisfy FED. R. CIV. P. 9(b) through reliance upon a presumption that the allegedly false and misleading 'group published information' complained of is the collective action of officers and directors." 60 F.3d at 593. *GlenFed* also held, however, that in order to rely on the "group published information" presumption, "Plaintiffs' complaint must contain allegations that an outside director either participated in the day-to-day corporate activities, or had a special relationship with the corporation, such as participation in preparing or communicating group information at particular times." *Id.* Failure to allege such participation or position constitutes a failure to link the individual in question to the claims against the defendant corporation.

■ Dawson resigned as Valence's CEO on April 30, 1993. The district court held that since Plaintiffs failed to specify the nature of Dawson's operational involvement in Valence after that date, they were

---

**9.** If we adopted inquiry notice and found that the *Forbes* article did raise sufficient suspicions to cause a reasonable investor to investigate further, we would then have to remand the case to the district court to determine when, if ever, a reasonably diligent investor should have discovered the facts underlying the alleged fraud. *See Sterlin,* 154 F.3d at 1205.

not entitled to the "group published information" presumption. Plaintiffs did allege in their Third Amended Complaint that Dawson remained Chairman of the Board until October 30, 1993. They also alleged that Dawson retained significant holdings in Valence after his resignation as CEO, and that he sold more than $30 million in stock in the months following. Plaintiffs did not, however, allege that Dawson had any operational involvement in Valence's day-to-day corporate activities. In fact, the Third Amended Complaint contains no allegations of how Dawson controlled or otherwise significantly influenced the alleged misstatements made by Valence after his resignation. Thus, the district court properly dismissed the claims against Dawson to the extent they are based on alleged misstatements made after his resignation.[10]

## IV.

Because the *Forbes* article was insufficient to induce a reasonable investor to investigate the possibility of fraud, we hold that the district court erred in dismissing Plaintiffs' suit on statute of limitations grounds. In so holding, we do not decide whether actual discovery or inquiry notice triggers the statute of limitations for section 10(b) actions. We affirm the district court's dismissal of the claims against Dawson that are based on alleged misstatements made after he resigned as CEO of Valence.

Accordingly, the decisions of the district court are AFFIRMED in part and REVERSED in part, and the case is REMANDED to the district court for proceedings consistent with this opinion.

Appellants are entitled to their costs against appellees except Dawson.

Appellee Dawson is entitled to his costs against appellants.

---

10. Plaintiffs cite *United States v. O'Hagan*, 521 U.S. 642, 117 S.Ct. 2199, 138 L.Ed.2d 724 (1997), to the contrary. *O'Hagan* recognized the "misappropriation theory" as a basis for liability under section 10(b) of the 1934 Act. Under that theory, "a person commits fraud 'in connection with' a securities transaction ... when he misappropriates confidential information for securities trading purposes, in breach of a duty owed to the source of the information." *Id.* 117 S.Ct. at 2207. Plaintiffs allege that under this theory, Dawson can be held liable for injury caused by fraudulent statements made by Valence after his resignation as CEO. Not so. *O'Hagan* does confirm that Dawson is liable for "misappropriation" to the extent the profits he realized from stock sales after his resignation derived from fraud he committed before resigning, but the district court's dismissal did not relate to such liability. The district court merely held that in the absence of specific allegations of how Dawson continued to control the company, he cannot be held liable for damage caused by misstatements made by Valence after his resignation as CEO.