Ferrin COLE; Chris Niemeyer; and Jason Niemeyer through his Guardian ad Litem Janet Niemeyer, Plaintiffs–Appellants,

and

John Niemeyer through his Guardian ad Litem Janet Niemeyer; Janet Niemeyer, individually and as a Taxpayer; Justin Hagan through his Guardian ad Litem Connie Hagan; Vanessa Ralston through her Guardian ad Litem Teresa Ralston; Doe I through her Guardian ad Litem Roe I; Doe II through his Guardian ad Litem Roe II; Doe III through his Guardian ad

Litem Roe III; Roe I, individually and as a Taxpayer; Roe II, individually and as a Taxpayer; Roe III, individually and as a Taxpayer, Appellants,

v.

OROVILLE UNION HIGH SCHOOL DISTRICT; Barry Kayrell, individually and as Superintendent of the Oroville Union High School District; Larry Payne, individually and as Principal of Oroville Union High School; Jeff Plotnick, individually and as Vice–Principal of Oroville Union High School; David Bruce; Roy Fisher; Kenneth Harlan; Susan Neben; Lillaine Speese, Defendants–Appellees.

No. 99–16550.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 12, 2000.

Filed Oct. 2, 2000.

---

Steven T. Burlingham, Gary, Till & Burlingham, Sacramento, California, for the plaintiffs-appellants.

Christian M. Keiner, Michelle L. Cannon, Girard & Vinson, Sacramento, California, for the defendants-appellees.

Marc D. Stern, American Jewish Congress, New York, New York, for the amicus curiae.

David F. McDowell, Michael I. Katz, Morrison & Foerster, LLP, Los Angeles, California, Sue Stengel, Anti-Defamation League of B'nai B'rith, Los Angeles, California, David Rosenberg, Anti-Defamation League of B'nai B'rith, New York, New York, for the amicus curiae.

John L. Bukey, Richard L. Hamilton, Judith M. Cias, California School Boards Association, West Sacramento, California, for the amicus curiae.

Before: SCHROEDER, HAWKINS and FISHER, Circuit Judges.

FISHER, Circuit Judge:

Ferrin Cole and Chris Niemeyer were students at Oroville High School ("Oroville") who graduated in 1998. They claim the Oroville Union High School District ("District") violated their freedom of speech by refusing to allow Niemeyer to give a sectarian, proselytizing valedictory speech and Cole to give a sectarian invocation at their graduation. We conclude the students' equitable claims are moot because Niemeyer and Cole have graduated, and their damage claims fail because the District officials' actions were reasonably taken to avoid violating the Establishment Clause of the First Amendment. As to the other parties who were added to the students' lawsuit—Chris Niemeyer's brother, Jason, and various Oroville students, parents and others—we conclude they lack standing either because they, too, have graduated or because the likelihood of their being selected to speak at a graduation or their attending a future graduation where some student speaker will attempt to offer a sectarian speech or invocation is too speculative to satisfy the injury-in-fact requirement of Article III. We thus affirm the district court's summary judgment in favor of all appellees.

## FACTUAL and PROCEDURAL BACKGROUND

Every year, Oroville High School conducts a formal graduation ceremony. The program for the event, as determined by the District, consists of welcoming remarks and the introduction of the District board of trustees and superintendent by the school principal, the singing of the National Anthem and a flag salute, a spiritual invocation delivered by a student chosen by a vote of his or her classmates, vocal selections, graduation speeches by the valedictorian and salutatorian, presentation of the class and diplomas, presentation of the class advisors, one or two farewell speeches and a recessional. Under a District policy instituted sometime around 1985, all student speeches and invocations for graduation are reviewed by the principal, who has the final say regarding their content. Due to increasing concern about the content of graduation speeches, Oroville's principal in recent years has reviewed the content of speeches and invocations to ensure they were not offensive or denominational. Until the class of 1998 graduation, the principal had needed to change the content of speeches only for grammatical errors. Although Oroville's policy does not specifically enumerate what types of content are prohibited, faculty advisors assisting in planning the 1998 graduation repeatedly told Cole and Niemeyer to make their presentations "nondenominational" and inclusive of all beliefs.

Oroville graduation ceremonies are held at a football field owned by the District and are paid for in part with District funds. Oroville plans the graduation program and administers the ceremony. Significantly, the principal has supervisory authority over all aspects of the ceremony. The District requires all students to sign a contract obligating themselves to act and dress in accordance with school directions at the graduation ceremony. A student does not have to attend the ceremony to obtain a diploma.

In the Fall of 1997, Niemeyer was informed that he was co-valedictorian of his class at Oroville. In April 1998, Cole was chosen by a vote of his classmates to offer an invocation at the graduation. Both Cole and Niemeyer were late in submitting early drafts of their graduation presentations for review by Oroville faculty advisors and the principal. Although the graduation ceremony was scheduled for June 5, 1998, Niemeyer did not share his speech with advisors or the principal until May 28, 1998, and Cole did not submit his invocation until June 2. Niemeyer stated he did not submit his speech to his faculty advisors for review of the speech's content "[b]ecause I know they don't hold the same convictions that I do as far as faith."

When Cole and Niemeyer finally submitted their proposed remarks for review by the principal's office, the principal told them to tone down the proselytizing and sectarian religious references. They were each advised to change their presentations to make them nondenominational. Niemeyer submitted a second draft of his speech, which included all of the original proselytizing and religious references to Jesus, and the principal informed him the speech was still unacceptable. The principal notified the District's superintendent and faxed him a copy of Niemeyer's speech. The superintendent consulted with the District's legal counsel, and agreed with the principal's decision to reject Niemeyer's speech because of its religious content. The superintendent and principal also discussed Cole's invocation shortly after Cole submitted it. The superintendent again obtained advice of counsel that Cole's invocation was impermissible sectarian prayer and agreed with the principal's decision to reject Cole's proposed invocation.

The superintendent met with Cole and Niemeyer to try to persuade them to delete the sectarian references from their proposed presentations by making them aware the graduation was a District-sponsored event for which the District was ultimately responsible. Nonetheless, Cole and Niemeyer refused to compromise, and on June 4 they filed suit in district court,

under 42 U.S.C. § 1983, to obtain a temporary restraining order preventing the school from denying them the opportunity to present their unedited remarks at graduation. The district court denied their motion for lack of time to consider the complex issue.

Cole and Niemeyer attended the June 5 graduation and Niemeyer attempted to deliver his unedited speech, but the principal refused to allow him to do so. Niemeyer's final proposed speech included a statement that he was going to refer to God and Jesus repeatedly, and if anyone was offended, they could leave the graduation. Niemeyer's proposed speech was a religious sermon which advised the audience that "we are all God's children, through Jesus Christ [sic] death, when we accept his free love and saving grace in our lives," and requested that the audience accept that "God created us" and that man's plans "will not fully succeed unless we pattern our lives after Jesus' example." Finally, Niemeyer's speech called upon the audience to "accept God's love and grace" and "yield to God our lives." Cole's proposed invocation referred repeatedly to the heavenly father and Father God, and concluded "We ask all these things in the precious holy name of Jesus Christ, Amen."

In December 1998, the district court heard the District's motion to dismiss all of the appellants' claims. The district court granted the District's motion to dismiss all of the claims against the District itself and the damage claims against District officials in their official capacities because the District was immune from suit under the Eleventh Amendment. The court also dismissed the damage claims against District officials in their individual capacities because it concluded the officials' decisions were protected by qualified immunity. However, it denied the motion to dismiss the injunctive claims against District officials in their official capacities under the rule of *Ex Parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908).

In early 1999, the appellants filed an amended complaint, including as parties Chris Niemeyer's brother, Jason—who had been chosen as valedictorian of the Oroville class of 1999 and planned to give a sectarian speech—as well as other students to secure standing given that both Cole and Chris Niemeyer had already graduated. The district court held that only Jason Niemeyer had standing to pursue the remaining injunctive claims.[1] Shortly thereafter, the appellants amended their complaint once more, adding a number of other students at Oroville, parents of students at Oroville and other persons who would likely attend Oroville graduations in the future. In June 1999, the district court again concluded only Jason Niemeyer had standing to bring a claim for injunctive relief, denied the plaintiffs' motion for a preliminary injunction and granted summary judgment in the defendants' favor on all claims. Jason Niemeyer has since graduated from Oroville High School, and presumably did not give his proposed sectarian speech.

## DISCUSSION

We review for abuse of discretion a district court's decision to deny a preliminary injunction. *See Bay Area Addiction Research and Treatment, Inc. v. City of Antioch*, 179 F.3d 725, 732 (9th Cir.1999). We review *de novo* a district court's grant of summary judgment. *See Balint v. Carson City*, 180 F.3d 1047, 1050 (9th Cir. 1999) (en banc). Viewing the evidence in the light most favorable to the nonmoving party, and drawing all reasonable inferences in its favor, we must determine "whether the district court correctly applied the relevant substantive law and whether there are any genuine issues of material fact." *Id.; accord Berry v. Valence Technology, Inc.*, 175 F.3d 699, 703 (9th Cir.), *cert. denied,* —— U.S. ——, 120 S.Ct. 528, 145 L.Ed.2d 409 (1999). Mootness and standing are questions of law we

---

1. Because the district court did not reject Cole's and Chris Niemeyer's standing to bring

the damage claims, Jason Niemeyer was added as a party only to the injunctive claim.

review *de novo. See Wade v. Kirkland,* 118 F.3d 667, 669 (9th Cir.1997) (mootness); *Sahni v. American Diversified Partners,* 83 F.3d 1054, 1057 (9th Cir.1996) (standing).

### I. Mootness and Standing

The appellants argue that Cole and Chris and Jason Niemeyer each has a live case or controversy for injunctive relief and damages related to the District's policy of refusing to permit sectarian, proselytizing speeches as part of the Oroville graduation. They rely on the "capable of repetition, yet evading review" exception to mootness and the third-party standing doctrines of First Amendment overbreadth and *jus tertii.* They argue further that the additional Oroville students have standing to bring suit because they may present valedictory speeches or invocations in the future and thus the District's policy will infringe upon their freedom of speech. Finally, they argue that the parents and additional students have standing to bring First Amendment free speech and establishment clause claims as prospective participants or attendees at future graduations. With the exception of Cole's and Niemeyer's damage claims, which we discuss below in the context of qualified immunity, we disagree with all of appellants' arguments.

### A. Whether the Claims Brought by Cole and Chris and Jason Niemeyer are Moot

■ As the Supreme Court has recently noted, both standing and mootness are jurisdictional issues deriving from the requirement of a case or controversy under Article III. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,* 528 U.S. 167, 120 S.Ct. 693, 703–04, 145 L.Ed.2d 610 (2000); *see also Blair v. Shanahan,* 38 F.3d 1514, 1518 (9th Cir. 1994) (" 'Article III of the Constitution requires that there be a live case or controversy at the time that a federal court decides the case . . . .' " (quoting *Burke v.*

*Barnes,* 479 U.S. 361, 363, 107 S.Ct. 734, 93 L.Ed.2d 732 (1987))). It is well-settled that once a student graduates, he no longer has a live case or controversy justifying declaratory and injunctive relief against a school's action or policy. *See Doe v. Madison Sch. Dist. No. 321,* 177 F.3d 789, 798 (9th Cir.1999) (en banc). Thus, this court has no jurisdiction to entertain the claims for injunctive relief brought by Cole and Chris and Jason Niemeyer unless an exception to mootness applies.

■ The "capable of repetition, yet evading review" exception to mootness applies only when (1) the challenged action is too short in duration to be fully litigated before cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subjected to the same action again. *See Spencer v. Kemna,* 523 U.S. 1, 17, 118 S.Ct. 978, 140 L.Ed.2d 43 (1998); *Madison Sch. Dist.,* 177 F.3d at 798. In *Madison School District,* we held that this exception did not apply to a student's Establishment Clause challenge to a school district's graduation prayer policy because the student had graduated, and thus would "never again be compelled to participate in a prayer at his or her high school graduation ceremony." 177 F.3d at 799. Similarly, as graduates of Oroville, Cole and Chris and Jason Niemeyer will never again be required to omit sectarian references from their Oroville graduation presentations. This case is therefore different from *Lee v. Weisman,* 505 U.S. 577, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992), in which the Supreme Court concluded that, although the student who objected to the graduation prayer at her middle school had herself graduated, the Court had "a live and justiciable controversy" before it because she was enrolled as a high school student in the same district and it appeared "likely, if not certain, that an invocation and benediction [would] be conducted at her high school graduation." *Id.* at 584, 112 S.Ct. 2649. Thus, Cole's and the Niemeyers' injunctive claims are moot.[2]

---

**2.** There is no allegation that either the voluntary cessation of harmful conduct or collater-

■ The appellants try to avoid the jurisdictional defect in the injunctive claims of Cole and Chris and Jason Niemeyer by asserting that they present a live controversy under the third-party standing doctrines of First Amendment overbreadth and *jus tertii.* Appellants' claim is more properly characterized as an overbreadth claim than as *jus tertii* because the appellants base their third-party claim on a theory that the District might in the future apply its policy to infringe the rights of students at Oroville, not that a single application of the District's policy threatens their rights as well as those of a third-party.[3] Nevertheless, whichever theory of third-party standing applies, Cole and Chris and Jason Niemeyer can no longer sustain such a claim.

■ Under the doctrine of *jus tertii,* a plaintiff can invoke the rights of third parties who are not before the court only if that plaintiff has "a sufficiently concrete interest in the outcome of the[ ] suit to make it a case or controversy subject to a federal court's Art. III jurisdiction...." *Singleton v. Wulff,* 428 U.S. 106, 112, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976); *accord Powers v. Ohio,* 499 U.S. 400, 411, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991); *see also* Note, *Standing to Assert Constitutional* Jus Tertii, 88 Harv. L. Rev. 423, 429 (1974) ("Because the judiciary's primary role in judicial review is to adjudicate the rights of the private parties before it, the mere fact that the constitutional rights of third parties may be in jeopardy provides no justification for judicial intervention."

(footnote omitted)). Similarly, only if he presents a *"case or controversy,* [may] a litigant ... challenge a statute by showing that it substantially abridges the First Amendment rights of other parties not before the court." *Village of Schaumburg v. Citizens for a Better Env't,* 444 U.S. 620, 634, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980) (emphasis added); *accord Bigelow v. Virginia,* 421 U.S. 809, 816–17, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975) (explaining that, in order to have overbreadth standing, a person must have "a 'claim of specific present objective harm or a threat of specific future harm,'" and concluding that this requirement is met "where there can be no doubt concerning the appellant's personal stake in the outcome of the controversy" (quoting *Laird v. Tatum,* 408 U.S. 1, 13–14, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972))). In short, a litigant cannot sustain an overbreadth or *jus tertii* claim if he no longer has a personal interest in the outcome which itself satisfies the case or controversy requirement. *See Howard v. City of Burlingame,* 937 F.2d 1376, 1381 n. 7 (9th Cir.1991) (noting that litigant's facial overbreadth challenge to city zoning ordinance requiring special permits for radio antennas over 25 feet became moot when the city granted his permit to erect such an antenna).

■ Although a student's graduation moots his claims for declaratory and injunctive relief against school officials, it does not moot his damage claims. *See Madison Sch. Dist.,* 177 F.3d at 798.

al legal consequences exceptions to mootness applies. *Cf. Madison Sch. Dist.,* 177 F.3d at 799 (discussing those exceptions in the graduation prayer context).

3. *Compare United States Dep't of Labor v. Triplett,* 494 U.S. 715, 720, 110 S.Ct. 1428, 108 L.Ed.2d 701 (1990) (concluding *jus tertii* standing is present where "enforcement of a restriction against the litigant prevents a third party from entering into a relationship with the litigant (typically a contractual relationship), to which relationship the third party has a legal entitlement (typically a constitutional entitlement)"), *with Broadrick v. Oklahoma,* 413 U.S. 601, 612, 93 S.Ct. 2908, 37

L.Ed.2d 830 (1973) (holding that, under the overbreadth doctrine, "[l]itigants, ... are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression"); *see generally* Richard H. Fallon, Daniel J. Meltzer & David L. Shapiro, *Hart & Wechsler's The Federal Court and The Federal System* 188 (4th ed. 1996) (distinguishing *jus tertii* standing from overbreadth challenges); Note, *Standing to Assert Constitutional* Jus Tertii, 88 Harv. L.Rev. 423, 423–24 (1974) (same).

Thus, we must address the damage claims brought by Cole and Chris Niemeyer and determine whether the District officials are entitled to qualified immunity for their decisions to refuse to allow these students to give a sectarian speech or prayer as part of the Oroville graduation ceremony.[4] Before we reach that question, we turn to the issue of whether the other appellants have standing to sustain the claims for injunctive relief.

### B. Whether Other Students, Parents and Others Likely to Attend Future Graduations Have Standing

■ Appellants argue that the other students, parents of Oroville students and others likely to attend future graduations joined in the third amended complaint have standing to bring a claim to enjoin the school from prohibiting sectarian speeches and prayers as part of the graduation ceremony. This argument fails because any injury to these parties is too speculative to satisfy the injury-in-fact requirement of Article III.

■ Article III standing requires an injury that is "actual or imminent, not 'conjectural' or 'hypothetical.'" *Whitmore v. Arkansas,* 495 U.S. 149, 155, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990) (quoting *City of Los Angeles v. Lyons,* 461 U.S. 95, 101–02, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983)). In the context of injunctive relief, the plaintiff must demonstrate a real or immediate threat of an irreparable injury. *See Lyons,* 461 U.S. at 110–11, 103 S.Ct. 1660.

In *Preferred Communications, Inc. v. City of Los Angeles,* 13 F.3d 1327 (9th Cir.1994) (per curiam), we held that a company unlawfully denied the opportunity to compete for a cable franchise lacked standing to bring damage claims against the city for profits the company would have received had it been awarded a franchise. *Id.* at 1333–34. We concluded the alleged injury was too uncertain because it depended on the "very speculative assumption" that the company would have received the franchise as the most qualified competitor and "would have built and operated a profitable cable franchise . . . if it had only been given the chance." *Id.* at 1334. Similarly, the other students, parents and others likely to attend future Oroville graduations lack standing because the likelihood that they will suffer a future injury depends upon the highly speculative assumption that a student seeking to give a sectarian speech or prayer will be chosen as valedictorian or salutatorian, or will be elected by classmates to deliver an invocation.[5] This threat of injury is neither real nor immediate. *Cf. Eggar v. Livingston,* 40 F.3d 312, 316–17 (9th Cir.1994) (holding that plaintiffs alleging city had policy of imprisoning indigent defendants without appointing counsel did not have standing to bring declaratory or injunctive claims because the likelihood that they would suffer future injury relied on a "'chain of speculative contingencies'") (quoting *Nelsen v. King County,* 895 F.2d 1248, 1252 (9th Cir. 1990)).

4. The district court correctly concluded it did not have jurisdiction over the appellants' damage claims against the District and District officials in their official capacities, because California school districts are state agencies and thus immune from damage suits under the Eleventh Amendment. *See Belanger v. Madera Unified Sch. Dist.,* 963 F.2d 248, 251–54 (9th Cir.1992); *see also Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989) ("[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office.").

5. The appellants did not pursue their claim of taxpayer standing before this court and have thus waived the issue. *See Ceja v. Stewart,* 97 F.3d 1246, 1252 (9th Cir.1996). Nevertheless, their claims of taxpayer standing would fail because the appellants have not identified tax dollars spent solely on the valedictory speech or the invocation or on the District's decision to refuse to allow sectarian speech at its graduation ceremonies. *See Madison Sch. Dist.,* 177 F.3d at 794; *see also id.* (concluding that taxpayer standing to challenge a particular graduation activity cannot be sustained by tax dollars spent on "ordinary costs of graduation that the school would pay whether or not the ceremony included [the challenged event]").

## II. Whether District Officials are Entitled to Qualified Immunity

We now turn to the merits of the damage claims brought by Cole and Chris Niemeyer. Cole and Niemeyer argue the District officials violated their clearly established right to speak at the Oroville graduation without content—or viewpoint-based restrictions on their speech. They contend the District's graduation ceremony is a public or limited public forum, and thus the District infringed their freedom of speech by discriminating against their presentations on the basis of their sectarian viewpoints. We disagree.

▬▬▬▬ When government officials assert the defense of qualified immunity to an action under 42 U.S.C. § 1983, a court evaluating the defense must first determine whether the plaintiff has alleged the deprivation of a constitutional right and, if so, then determine " 'whether the right was clearly established at the time of the alleged violation.' " *Wilson v. Layne*, 526 U.S. 603, 609, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999) (quoting *Conn v. Gabbert*, 526 U.S. 286, 290, 119 S.Ct. 1292, 143 L.Ed.2d 399 (1999)); *County of Sacramento v. Lewis*, 523 U.S. 833, 841 n. 5, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998); *B.C. v. Plumas Unified Sch. Dist.*, 192 F.3d 1260, 1265 (9th Cir.1999).[6] Thus, we must decide whether the District officials infringed the students' freedom of speech by refusing to allow them to give a sectarian speech or prayer as part of the Oroville graduation ceremony.

We conclude the District officials did not violate the students' freedom of speech. Even assuming the Oroville graduation ceremony was a public or limited public forum, the District's refusal to allow the students to deliver a sectarian speech or prayer as part of the graduation was nec-

essary to avoid violating the Establishment Clause under the principles applied in *Santa Fe Independent School District v. Doe*, —— U.S. ——, 120 S.Ct. 2266, 147 L.Ed.2d 295 (2000), and *Lee v. Weisman*, 505 U.S. 577, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992). *See Rosenberger v. Rector and Visitors of the Univ. of Va.*, 515 U.S. 819, 837, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995) (analyzing whether a university's viewpoint discrimination was excused by the necessity of complying with the Establishment Clause); *Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 761–62, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995) ("There is no doubt that compliance with the Establishment Clause is a state interest sufficiently compelling to justify content-based restrictions on speech."); *see also Arkansas Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 677, 118 S.Ct. 1633, 140 L.Ed.2d 875 (1998) (noting that strict scrutiny of exclusion of speech in a government forum requires that the exclusion be " 'necessary to serve a compelling state interest and the exclusion [be] narrowly drawn to achieve that interest.' " (quoting *Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.*, 473 U.S. 788, 800, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985))).

In *Santa Fe*, the Supreme Court held that a school district policy authorizing a student selected by a vote of fellow students to deliver a nonsectarian and nonproselytizing "statement or invocation" to solemnize varsity football games violated the Establishment Clause. 120 S.Ct. at 2273 n. 6, 2283. The Court rejected the argument that the student's prayer was private speech, because not only did the school district authorize the invocation through its policy and allow the invocation to be held on government property at a government-sponsored school-related event, it also exercised control over the invocation by placing restrictions on its

---

6. Cole and Chris Niemeyer also alleged they were denied due process when the District refused to allow them to give a sectarian speech or prayer at the graduation ceremony without a hearing as required by the District's policy on student freedom of speech. Even if the District's policy creates an entitlement cognizable under the Due Process Clause, this claim fails because the policy only requires a hearing upon request of the student, and neither student requested such a hearing.

content, allowing only selected students to give the invocation and broadcasting the invocation over the school's public address system. *See id.* at 2275–78. The Court reasoned that the district's control over and entanglement with the invocation not only would cause an objective observer to perceive the district endorsed the religious message of the invocation, but also constituted an actual endorsement of religion in public schools. *See id.* at 2278–79. Thus, the Court concluded, under the principles articulated in *Lee,* the delivery of the invocation before school football games impermissibly applied social and peer pressure to coerce dissenters to forfeit their right to attend the games "'as the price of resisting conformance to state-sponsored religious practice.'"[7] *Id.* at 2280 (quoting *Lee,* 505 U.S. at 596, 112 S.Ct. 2649). The Court further concluded that the pregame delivery of the invocation had the improper effect of coercing those present to participate in an act of religious worship. *See id.; see also Lee,* 505 U.S. at 594, 112 S.Ct. 2649 ("[T]he government may no more use social pressure to enforce orthodoxy than it may use more direct means.").

In *Lee,* the Court held that a school district violated the Establishment Clause when it invited a rabbi to deliver a nonsectarian, nonproselytizing prayer at its graduation ceremony. 505 U.S. at 581, 599, 112 S.Ct. 2649. The Court reasoned that, because the principal decided that an invocation should be given, chose the rabbi and gave her guidelines for the prayer and the school had extensive control over the graduation ceremony—including control over the contents and timing of the program, the speeches, the dress code and the decorum of the students—the prayer bore the imprint of the state. *Id.* at 587–90, 597, 112 S.Ct. 2649. The Court noted that the singular importance of a high school grad-

uation as a once-in-a-lifetime event and the susceptibility of adolescents to peer and social pressure left a dissenting student with the unduly coercive dilemma of participating in the prayer against her conscience or missing her own high school graduation. *See id.* at 592–96, 112 S.Ct. 2649. Because this dilemma gave dissenting students no legitimate alternative to attending their graduation, the Court concluded the school district had in effect "compelled ... participation in an explicit religious exercise." *Id.* at 598, 112 S.Ct. 2649.

### A. Cole's Invocation

■ Applying these principles to the present case, it is clear the District's refusal to allow Cole to deliver a sectarian invocation as part of the graduation ceremony was necessary to avoid an Establishment Clause violation. The invocation would not have been private speech, because the District authorized an invocation as part of the graduation ceremony held on District property, allowed only a student selected by a vote of his classmates to give an invocation and no doubt would have used a microphone or public address system to amplify the invocation to the audience at the graduation ceremony. *See Santa Fe,* 120 S.Ct. at 2275–78; *see also Collins v. Chandler Unified Sch. Dist.,* 644 F.2d 759, 760–62 (9th Cir.1981) (holding that district policy under which principal and district superintendent gave student council permission to select a student to open school assemblies with prayer constituted impermissible government sponsorship of religious activity under the Establishment Clause). In addition, as the Court noted in *Santa Fe,* an invocation policy by its very terms appears to reflect an impermissible state purpose to encourage a religious message.[8] 120 S.Ct. at

---

**7.** In both *Santa Fe* and *Lee,* the Court emphasized that the threat of coercion caused by public and peer pressure to attend important school events is heightened in the public high school context because adolescents are more susceptible to such pressure, especially as to issues of social convention. *See Santa Fe,* 120

S.Ct. at 2280; *Lee,* 505 U.S. at 592–93, 112 S.Ct. 2649.

**8.** In the wake of *Santa Fe,* it may be that the District's invocation policy itself violates the Establishment Clause. *See* 120 S.Ct. at 2278–79, 2282. We do not reach this issue, however, because it was not raised.

2277 (concluding that term "invocation" is "a term that primarily describes an appeal for divine assistance"). Furthermore, Cole's sectarian invocation would have caused a more serious Establishment Clause violation than in *Santa Fe* because there the invocation was required to be "nonsectarian and nonproselytizing." *Id.* at 2273 n. 6; *Lee*, 505 U.S. at 589, 112 S.Ct. 2649 (noting that a nonsectarian prayer "is more acceptable than one which, for example, makes explicit reference to the God of Israel, or to Jesus Christ"); *County of Allegheny v. ACLU, Greater Pittsburgh Chapter*, 492 U.S. 573, 603, 109 S.Ct. 3086, 106 L.Ed.2d 472 ("The legislative prayers involved in *Marsh* did not violate this principle [against government affiliation with a particular religious sect] because the particular chaplain had 'removed all references to Christ.'" (quoting *Marsh v. Chambers*, 463 U.S. 783, 793 n. 14, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983))); *Doe v. Santa Fe Indep. Sch. Dist.*, 168 F.3d 806, 809, 815 (5th Cir.1999) (holding that a graduation policy that does not limit speakers to "nonsectarian, nonproselytizing speech" violates the Establishment Clause), *aff'd on other grounds,* —— U.S. ——, 120 S.Ct. 2266, 147 L.Ed.2d 295 (2000).

### B. Chris Niemeyer's Proposed Valedictory Speech

■ Chris Niemeyer's valedictory speech presents a more difficult issue as to whether the speech was private or attributable to the District. As the appellants argue, the valedictorian speech policy neither encourages a religious message nor subjects the speaker to a majority vote that operates to ensure only a popular message is expressed at the graduation. *See Santa Fe*, 120 S.Ct. at 2276–77. Nonetheless, we conclude the District's plenary control over the graduation ceremony, especially student speech, makes it apparent Niemeyer's speech would have borne the imprint of the District. *See Lee*, 505 U.S. at 590, 112 S.Ct. 2649. First, the District authorizes the valedictory speech as part of the District-administered graduation

ceremony, which is held on District property and financed in part by District funds and in which only selected students are allowed to speak. *See Santa Fe*, 120 S.Ct. at 2275–76. Second, the principal retains supervisory control over all aspects of the graduation, and has final authority to approve the content of student speeches. *See id.* Third, the District requires the students to sign a special contract obligating them to act and dress in a manner prescribed by the District. *See Lee*, 505 U.S. at 597, 112 S.Ct. 2649. Finally, the speech presumably is broadcast to the audience over a school microphone or public address system. *See Santa Fe*, 120 S.Ct. at 2279.

Allowing Niemeyer to give his proposed valedictory speech at the Oroville graduation would have constituted government endorsement of religious speech similar to the prayer policies found unconstitutional in *Santa Fe* and *Lee*. Because District approval of the content of student speech was required, allowing Niemeyer to make a sectarian, proselytizing speech as part of the graduation ceremony would have lent District approval to the religious message of the speech. Equally important, an objective observer familiar with the District's policy and its implementation would have likely perceived that the speech carried the District's seal of approval. *See id.* at 2278; *Santa Fe*, 168 F.3d at 817–18 ("[W]hen the school 'permits' sectarian and proselytizing prayers—which, by definition, are designed to reflect, and even convert others to, a particular religious viewpoint ...—such 'permission' undoubtedly conveys a message not only that the government endorses religion, but that it endorses a particular form of religion."). The District's actual and perceived endorsement of Niemeyer's proselytizing would have sent a message to dissenting members of the audience that "'they are outsiders, not full members of the political community,'" *Santa Fe*, 120 S.Ct. at 2279 (quoting *Lynch v. Donnelly*, 465 U.S. 668, 688, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984)), thereby pressuring the dissenters to

change their religious views to gain acceptance.

 Including Niemeyer's sectarian, proselytizing speech as part of the graduation ceremony also would have constituted District coercion of attendance and participation in a religious practice because proselytizing, no less than prayer, is a religious practice. *See Texas Monthly v. Bullock,* 489 U.S. 1, 23, 109 S.Ct. 890, 103 L.Ed.2d 1 (1989) (noting that proselytizing is religious activity protected under the Free Exercise Clause); *Follett v. McCormick,* 321 U.S. 573, 576–77, 64 S.Ct. 717, 88 L.Ed. 938 (1944) (noting that proselytizing, including preaching and distribution of religious literature, is religious activity protected under the Free Exercise Clause); *Murdock v. Pennsylvania,* 319 U.S. 105, 108–10, 63 S.Ct. 870, 87 L.Ed. 1292 (1943) (same). As the Court acknowledged in *Lee,* our society recognizes that even simply standing or remaining silent can signify adherence to the views of others. Thus, allowing Niemeyer's speech at graduation would have compelled a dissenter's implicit participation in the proselytizing. It is no answer that some, or even most, dissenters might have believed their silence signified respectful disagreement. The critical inquiry under *Santa Fe* and *Lee* to determine if religious activity at a major public school event constitutes impermissible coercion to participate is whether "a reasonable dissenter ... *could* believe that the group exercise signified her own participation or approval of it." *Lee,* 505 U.S. at 593, 112 S.Ct. 2649 (emphasis added). "[T]he choice between whether to attend [a school event] or to risk facing a personally offensive religious ritual is in no practical sense an easy one. The Constitution ... demands that [a] school many not force this difficult choice upon [its] students for '[i]t is a tenet of the First Amendment that the State cannot require one of its citizens to forfeit his or her rights and benefits as the price of

resisting conformance to state-sponsored religious practice.'" *Santa Fe,* 120 S.Ct. at 2280 (quoting *Lee,* 505 U.S. at 596) (final alteration in original).

We, like the Supreme Court, "recognize the important role that public worship plays in many communities, as well as the sincere desire to include public prayer as a part of various occasions so as to mark those occasions' significance. But such religious activity in public schools, as elsewhere, must comport with the First Amendment." *Id.* at 2278. Cole and Niemeyer remained free to pray and to proselytize outside of school or in contexts where the District would not have been an actual or perceived party to their religious activities. Indeed, the Religion Clauses promote robust private religious debate, allowing each religion to "flourish according to the zeal of its adherents and the appeal of its dogma." *Zorach v. Clauson,* 343 U.S. 306, 313, 72 S.Ct. 679, 96 L.Ed. 954 (1952). However, "[t]he Constitution decrees that religion must be a private matter for the individual, the family, and the institutions of private choice, and that while some [government] involvement and entanglement are inevitable, lines must be drawn." *Lemon v. Kurtzman,* 403 U.S. 602, 625, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971); *see also Lee,* 505 U.S. at 589, 112 S.Ct. 2649 ("[P]reservation and transmission of religious beliefs and worship is a responsibility and a choice committed to the private sphere...."). The requirement that religion be left to the private sphere is the product of a well-documented and turbulent history, demonstrating that "in the hands of government what might begin as a tolerant expression of religious views may end in a policy to indoctrinate and coerce." *Lee,* 505 U.S. at 591–92, 112 S.Ct. 2649. This danger is most apparent here, where allowing the students to engage in sectarian prayer and proselytizing as part of the graduation ceremony would amount to government sponsorship of, and coercion to participate in, particular religious practices.[9]

9. Avoiding an Establishment Clause violation is also a sufficiently compelling interest to justify any burden the District officials' deci-

sions had upon Cole's and Chris Niemeyer's right to the free exercise of religion. *See, e.g., Lee,* 505 U.S. at 587, 112 S.Ct. 2649 ("The

## CONCLUSION

We hold that Cole and Chris and Jason Niemeyer can no longer sustain their equitable claims now that they have all graduated from Oroville High School. We further hold that the other Oroville students, parents of Oroville students and other persons likely to attend future graduations lack standing because the likelihood that they will in fact suffer an injury is too speculative. Finally, we hold that, although Cole and Chris Niemeyer have standing to bring damage claims against District officials, the officials did not violate the students' right to freedom of speech. Rather, District officials acted reasonably to avoid violating the Establishment Clause.

AFFIRMED.

principle that government may accommodate the free exercise of religion does not supersede the fundamental limitations imposed by the Establishment Clause."); *Wisconsin v. Yoder*, 406 U.S. 205, 220–221, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) ("The Court must not ignore the danger that an exception from a general obligation of citizenship on religious grounds may run afoul of the Establishment Clause....").