**In re INFONET SERVICES CORPORATION SECURITIES LITIGATION**

No. CV 01–10456 NM.

United States District Court, C.D. California.

Aug. 12, 2003.

Edward P. Dietrich, Helen J. Hodges, William S. Lerach, Milberg, Weiss, Bershad, Hynes & Lerach, San Diego, CA,

Jonathan E. Behar, Milberg, Weiss, Bershad, Hynes & Lerach, Kevin M. Prongay, Prongay & Borderud, Lionel Z. Glancy, Michael M. Goldberg, Robert M. Zabb, Glancy & Binkow, Los Angeles, CA, for Plaintiffs.

Hugh S. Wilson, Latham & Watkins, San Diego, CA, John B. Quinn, Shon Morgan, Thad Alan Davis, Quinn, Emanuel, Urquhart, Oliver & Hedges, Los Angeles, CA, Julia E. Parry, Ryan Hart Harrigan, Leigh A. Bradberry, Elisabeth R. Cannon, Latham & Watkins, San Diego, CA, Charles F. Kester, Kester & Isenberg, Encino, CA, George Borden, Williams & Connolly, Matthew J. Herrington, Paul Martin Wolff, Washington, DC, Marc Marmaro, Jeffer, Mangels, Butler & Marmaro, Germain D. Labat, III, Mayer, Brown, Rowe & Maw, Debra J. Albin–Riley, Winston & Strawn, Los Angeles, CA, David M. Jacobson, Evan L. Schwab, Dorsey & Whitney, Seattle, WA, Kent J. Schmidt, Dorsey & Whitney, Irvine, CA, Ralph A. Taylor, Jr., Dorsey & Whitney, Washington, DC, Marc T. G. Dworsky, Munger, Tolles & Olson, Los Angeles, CA, for Defendants.

ORDER GRANTING DEFENDANTS MERRILL LYNCH & CO., INC., UBS WARBURG LLC, ABN AMRO, GOLDMAN, SACHS, & CO., LEHMAN BROTHERS, AND SALOMON SMITH BARNEY INC.'S MOTION TO DISMISS

ORDER GRANTING DEFENDANTS KDDI CORP., KPN TELECOM, SWISSCOM AG, TELEFONICA INT'L HOLDING B.V., TELIA AB, AND TELSTRA CORP. LTD.'S MOTION TO DISMISS

MANELLA, District Judge.

## I. INTRODUCTION

On December 16, 1999, Infonet Services Corporation made an initial public offering ("IPO") of its Class B common stock. Since the IPO, Infonet's initial stock price of $21 has declined significantly. Plaintiffs allege that the drop in Infonet's stock price was caused by problems arising out of Infonet's management of AT & T Unisource Communications Services ("AUCS"). Plaintiffs assert that Defendants knew about these problems prior to the IPO, but fraudulently concealed this information both during and shortly after the IPO in an effort to inflate the price of Infonet's publicly traded stock. As a result, Plaintiffs brought the instant class action against Infonet, its directors, the underwriters who were involved with Infonet's IPO, and various foreign telecommunications companies that owned shares of Infonet. The Plaintiff Class consists of all purchasers of Infonet's publicly-traded securities from December 16, 1999, the day of Infonet's IPO, through August 7, 2001 (the "Class Period"). Compl. ¶ 4. Plaintiffs assert that Defendants' conduct in connection with Infonet's IPO violated the Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act of 1934 (the "Securities Exchange Act").

Plaintiffs assert claims against Defendants KPN Telecom, Swisscom AG, Telia AB, KDDI Corporation Japan, Telefonica International Holding, B.V., and Telstra Corporation Limited (collectively, the "Foreign Telecoms") for: (1) violations of §§ 11 and 15 of the Securities Act; (2) violations of §§ 12(a)(2) and 15 of the Securities Act; (3) violations of § 10(b) of the Securities Exchange Act; and (4) violations of § 20(A) of the Securities Exchange Act. Plaintiffs assert claims against Defendants Merrill Lynch & Co., Inc., UBS Warburg LLC, ABN AMRO, Goldman, Sachs & Co., Lehman Brothers, and Salomon Smith Barney Inc. (collectively, the "Underwriters") for: (1) violations of

§§ 11 and 15 of the Securities Act; and (2) violations of § 10(b) of the Securities Exchange Act.[1] Currently before the court is the Underwriters' and Foreign Telecoms' (collectively, "Movants") motions to dismiss the Complaint under Rule 12(b)(6) on the ground that Plaintiffs failed to name them as Defendants within the applicable statutes of limitations.

## II. FACTUAL BACKGROUND [2]

In 1969, Infonet began operations as part of Computer Sciences Corporation ("CSC"). *See* Infonet Prospectus, Parry Decl., Ex. A at 4. After a series of transactions from 1988 to 1992, CSC sold its ownership in Infonet to a group of six major international telecommunications companies, including KDD Corporation (Japan), KPN Telecom B.V. (The Netherlands), Swisscom AG (Switzerland), Telefónica International Holding B.V. (Spain), Telia AB (Sweden), and Telstra Corporation Limited (Australia). *See id.* at 45; Compl. ¶ 5, 33. Infonet provides data communications services to multinational corporations in more than 100 countries through "The World Network," its own data communications network that purportedly serves as a private and secure version of the Internet for its clients. *See* Infonet Prospectus, Parry Decl., Ex. A at 4; Compl. ¶ 25. Infonet sells its services

through its country representatives and indirectly through major international telecommunications carriers and value added resellers. Compl. ¶ 25.

### 1. The AUCS Transaction

AT & T Unisource Communications Services ("AUCS") was a joint venture between AT & T Corporation and Unisource N.V. *See* Infonet Prospectus, Perry Decl., Ex. A at 5; Compl. ¶ 5. AUCS provided international voice, data, Internet, and messaging services to corporations located primarily in Europe and the United States. Infonet Prospectus, Perry Decl., Ex. A at 5. Unisource is owned by three of Infonet's stockholders, KPN, Swisscom, and Telia. Compl. ¶ 5. In July 1998, AT & T announced that it would opt out of the joint venture, prompting AUCS to seek a new partner capable of outsourcing its services beyond Europe and providing international networking services previously provided by AT & T. *Id.*

Plaintiffs allege that AUCS could not be sold to an independent third party because it did not have adequate accounting systems in place to bill its customers for their network usage on a monthly basis. *See* Compl. ¶ 6. Instead, AUCS "revenues" were determined by a year-end negotiation between AUCS and its owners, KPN, Swisscom, and Telia. *Id.* Thus, Plaintiffs assert, KPN, Swisscom, and Telia knew

---

**1.** Throughout the Complaint, Plaintiffs clearly stated which Defendants were named in which claims. They did not name the Underwriters as Defendants in their § 12(a)(2) claim. Plaintiffs assert that the court should nonetheless consider the Underwriters as Defendants in this claim. *See* Mot. at 10–11 n. 14. Even under the liberal pleading standards of Fed. R. Civ. 8, a plaintiff must set forth a "short plain statement of the claim that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 168, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993) (quoting *Conley v. Gibson,*

355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). It is not too much to ask that Plaintiffs identify (a) whom they are suing and (b) the statutory provision alleged to have been violated.

**2.** These facts, taken from the Consolidated Class Action Complaint ("Complaint") and Infonet's Prospectus issued December 15, 1999, are assumed to be true for purposes of this motion only. Infonet's Prospectus was submitted to the court by Infonet and the Individual Defendants in connection with their motion to dismiss.

that AUCS could not be sold to an independent company because these accounting problems would be uncovered by the buyer during the "due diligence" investigation. *Id.* Plaintiffs allege that to avoid these problems, KPN, Swisscom, and Telia allegedly agreed "to dump the AUCS business on Infonet, another company they controlled." *Id.*

On September 30, 1999, Infonet entered into a series of agreements with AUCS, Unisource, KPN, Swisscom, and Telia ("the Agreements"), under which it agreed to manage AUCS for a three-year term.[3] Infonet represented to the public that one benefit of the Agreements was that Infonet would gain access to approximately 1,300 multinational clients of KPN, Swisscom, and Telia that were being served by AUCS at the time of the transaction, as well as to any additional multinational clients KPN, Swisscom, and Telia would serve in the future. *See* Infonet Prospectus, Parry Decl., Ex. A at 55; Compl. ¶ 7. Infonet asserted that through this access, Infonet could market its services with the aim of transitioning the multinational clients to The World Network, thus significantly increasing its client base. Defendants allegedly represented that Infonet's "infrastructure will be sufficient to transition these clients" to The World Network. Compl. ¶ 7. In exchange for the right to market its services to the multinational clients and $40 million in cash, Infonet issued an aggregate of 47.87 million shares of Infonet's Class B stock to KPN, Swisscom, and Telia under stock purchase agreements. Infonet Prospectus, Parry Decl., Ex. A at 5.

Plaintiffs assert that Defendants concealed the "true nature" of the transaction, *viz.,* that Infonet *de facto* purchased AUCS "on credit in an 'off-balance' sheet transaction[.]" Compl. ¶ 28; Opp. at 6.[4] Plaintiffs

---

3. The Agreements are attached to Infonet's Registration Statement as Exhibits 10.12, 10.13, 10.14, and 10.15. *See* Parry Decl., Exs. C–F. The Agreements are as follows. In the "Assignment Agreement," Infonet was assigned all the distributor contracts between AUCS and distributors KPN, Swisscom, Telia, and others. *See* Parry Decl., Ex. F. Infonet also was assigned the obligation to deliver services to the distributors. The distributors had agreements to provide services to the end-users of AUCS services ("AUCS users"). *Id.*

Pursuant to a "Services Agreement," AUCS, Unisource, Swisscom, and Telia allegedly agreed to assign Infonet the services contracts that AUCS previously provided to the distributors. Infonet would then sell these services to the distributors. *See* Parry Decl., Ex. E. Under the Services Agreement, Infonet would buy the services at a price that would guarantee Infonet approximately 20% gross margin on the sale of the services to the various distributors. *Id.* The Services Agreement was terminable by any party on 180 days notice. *Id.* ˙ ·

Pursuant to a "Management Agreement," Infonet agreed to Manage AUCS for three years for a quarterly management fee equal to 1.5% of the total consolidated revenues of AUCS, up to an aggregate maximum of $18.3 million. *See* Parry Decl., Ex. E. Infonet also could receive an incentive payment based on any improvement in AUCS' financial performance at the end of the three-year term. *Id.* Unisource, as the owner of AUCS, had the right to terminate the Management Agreement on 180 days notice. *Id.*

Finally, Infonet entered into a "Call Option Deed," which gave Infonet the option to purchase the assets of AUCS over a period of three years at a fair market value not to exceed $130 million. Parry Decl., Ex. D. The deed allowed Infonet to purchase the AUCS assets so that it could continue to offer AUCS services to Infonet clients if the Services Agreement was terminated. *Id.* The call option was subject to regulatory approval, and was conditioned on AUCS's ability to fulfill its contractual obligations to third parties. *Id.*

4. Plaintiffs bolster this assertion with allegations that the AUCS transaction originally announced that Infonet would acquire AUCS pursuant to a Memorandum of Understanding ("MOU"), by which Infonet would acquire all

assert that KPN, Swisscom, and Telia structured the transaction through the Agreements to avoid numerous problems. First, the transaction allegedly allowed KPN, Swisscom, and Telia to sell AUCS before incurring a loss of AT & T's annual "revenues." *See* Compl. ¶ 38. Second, it allegedly allowed Unisource to "sell" AUCS publicly despite the fact that AUCS's accounting policies allegedly did not conform to GAAP, and were purportedly not in compliance with the Foreign Corrupt Practices Act's "books and records" provisions, as set forth in § 13(b)(2) of the Securities Exchange Act. *Id.* Finally, the transaction purportedly allowed Unisource and its owners, KPN, Swisscom, and Telia, to avoid various disclosures about AUCS's losses as required under the Securities Act, 15 U.S.C. § 77aa. *Id.*

## 2. The Initial Public Offering

On December 15, 1999, the SEC declared Infonet's Prospectus and Registration Statement effective. Compl. ¶ 54.[5] In the Prospectus, Infonet described the AUCS transaction in detail. *See* Infonet Prospectus, Parry Decl., Ex. A at 5, 55–56. In its discussion of the AUCS transaction, the Prospectus stated that the Agreements "will give us access to [KPN, Swisscom and Telia's] approximately 1,300 multinational corporate clients currently being served by AUCS as well as additional multinational clients to which KPN, Swisscom and Telia may provide services in the future." *Id.* at 5, 55. The Prospectus also stated that Infonet "believes our infra-

structure will be sufficient to transition these clients." *Id.* at 56.

The Prospectus cautioned, however, that "[w]hile we will attempt to transition the multinational clients to The World Network as soon as possible, we expect the transition will be implemented over a period of 12 to 18 months." Infonet Prospectus, Parry Decl., Ex. A at 56. The Prospectus further cautioned that "[t]he percentage of total revenues from the multinational clients attributable to AUCS services and to our services is expected to vary depending on the degree of the transition's success and the time necessary to transition the multinational clients to The World Network." *Id.* at 56. The Prospectus warned future investors that "[s]ince the multinational clients have no obligation to use our services, we cannot assure you that all of the multinational clients will transition to our network, that the multinational clients which do transition to our network will continue to purchase our services or, if they continue to use our services after the transition, that the multinational clients will purchase as many or more services from us than they did from AUCS." *Id.* The Prospectus disclosed that AUCS had a history of operating losses, totaling approximately $409 million over a three-year period. *See id.* at 56 ("From its formation in 1996 to December 31, 1998, AUCS cumulative EBITDA losses were approximately $409 million.").

---

of AUCS's assets. Compl. ¶ 39. Plaintiffs allege that during the "due diligence" investigation of the AUCS acquisition, Infonet executives learned of AUCS's inability to invoice the end-users of AUCS services, and that revenues were instead negotiated annually. *See* Compl. ¶¶ 43, 92. Plaintiffs assert that because Defendants wanted to offer an IPO of Infonet stock they did not want to acquire AUCS outright, as such an acquisition would

require them to present three years of AUCS's audited financial statements in conjunction with the IPO. Compl. ¶¶ 44–46. As a result, Plaintiffs argue, Defendants restructured the transaction in an attempt to disguise a *de facto* sale as a management agreement. *Id.*

5. The Registration Statement was signed by Defendants Collazo, Firdosy, Campbell, de Jong, Ekberg, Kojima, Nancoz, and Sagrario.

Plaintiffs assert that the Prospectus was misleading because it failed to disclose numerous facts they assert were material to the value of the stock. For instance, Plaintiffs allege that the Prospectus failed to disclose various technological hurdles rendering the transition of AUCS users to the World Network difficult. Such technological problems included the differing types and locations of switches used in the AUCS and Infonet networks, the visibility of the end-users in the AUCS and Infonet networks, and the inability of AUCS to invoice end-users monthly. *See* Compl. ¶¶ 75–93. Plaintiffs also assert that the Prospectus's figure of 1,300 multinational AUCS users was significantly inflated. Finally, Plaintiffs allege that the Prospectus misrepresented the nature of the AUCS transaction, and failed to disclose AUCS's alleged accounting problems. *See* discussion *supra* at 1110–11.

On December 16, 1999, the IPO commenced at an offering price of $21 per share. Compl. ¶ 54. As set forth in the Prospectus, the managing underwriters for the IPO were Merrill Lynch & Co., Warburg Dillon Read LLC, ABN AMRO Rothschild, Goldman, Sachs & Co., Lehman Brothers, and Salomon Smith Barney. *Id.* ¶ 55; Parry Decl., Ex. A. During the IPO, the Foreign Telecoms allegedly sold over 20 million shares of Infonet stock for proceeds of over $400 million. *Id.* ¶ 4. Infonet and the selling shareholders purportedly sold 51,282,300 shares of common stock at $21.00 per share for an aggregate price of approximately $1,076 billion. *Id.* ¶ 54. The Registration Statement also provided the underwriters an option to purchase an additional 7,692,342 shares of common stock to cover over allotments. *Id.* On January 13, 2000, the underwriters allegedly purchased these additional shares. *Id.*

### 3. The Nature of the Instant Action

Plaintiffs allege that Infonet's stock price dropped when the market learned the allegedly "true" facts about the AUCS transaction. *See* Compl. ¶¶ 122–128. Plaintiffs assert that Defendants fraudulently concealed: (1) that the migration of AUCS users to the Infonet network was prohibitively expensive and complicated; (2) that AUCS required massive upgrades with its financial and billing systems; and (3) the "true nature" of the AUCS transaction. Plaintiffs allege that if Defendants had disclosed this information at the time of the IPO, Defendants could not have taken Infonet public, as the market would have been unreceptive to such disclosures. As a result of these purported misrepresentations, Plaintiffs allege, Infonet's stock traded at inflated levels during the Class Period, only to fall significantly as the problems with its AUCS business were revealed to the market.

### 4. Procedural History

The initial complaint in this action was filed December 5, 2001, naming as Defendants Infonet and its CEO. The initial complaint was filed on behalf of all purchasers of Infonet securities between December 16, 1999 and July 31, 2001. Thereafter, seven similar complaints were filed, none of which named the Foreign Telecoms or the Underwriters. On July 3, 2002, Plaintiffs filed a consolidated class action complaint ("Complaint"), which, for the first time, named the Foreign Telecoms and the Underwriters as Defendants. On January 13, 2003, the underlying related actions were voluntarily dismissed by the parties.

### III. LEGAL STANDARD

A Rule 12(b)(6) motion to dismiss tests the legal sufficiency of the claims asserted in the complaint and is proper only where there is either a "lack of a cognizable legal

theory" or "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't,* 901 F.2d 696, 699 (9th Cir.1988). When evaluating a Rule 12(b)(6) motion, the court must accept all material allegations in the complaint as true and construe them in the light most favorable to the non-moving party. *See Barron v. Reich,* 13 F.3d 1370, 1374 (9th Cir.1994). However, the court is not bound to assume the truth of legal conclusions merely because they are stated in the form of factual allegations. *See Western Mining Council v. Watt,* 643 F.2d 618, 624 (9th Cir.1981). Dismissal is proper if a complaint is vague, conclusory, or fails to set forth material facts in support of the allegation. *See North Star Int'l v. Arizona Corp. Comm'n,* 720 F.2d 578, 583 (9th Cir.1983); *see also Bautista v. Los Angeles County,* 216 F.3d 837, 841 (9th Cir.2000) (holding that dismissal for failure to comply with Federal Rules of Civil Procedure is within the court's discretion). Plaintiff bears the burden of pleading sufficient facts to state a claim. Courts will not supply essential elements of a claim that were not initially pled. *Richards v. Harper,* 864 F.2d 85, 88 (9th Cir.1988).

Generally, a court may not consider material outside of the complaint, unless a court converts the Rule 12(b)(6) motion into a summary judgment. *See Levine v. Diamanthuset, Inc.,* 950 F.2d 1478, 1483 (9th Cir.1991). A court may, however, consider exhibits submitted with the complaint and matters that may be judicially noticed pursuant to Fed.R.Evid. 201. *Hal Roach Studios, Inc. v. Richard Feiner & Co.,* 896 F.2d 1542, 1555 n. 19 (9th Cir. 1989); *Mack v. South Bay Beer Distributors, Inc.,* 798 F.2d 1279 (9th Cir.1986), *abrogated on other grounds by Astoria*

*Federal Savings and Loan Ass'n v. Solimino,* 501 U.S. 104, 111 S.Ct. 2166, 115 L.Ed.2d 96 (1991). On a motion to dismiss the securities law claims asserted in this case, however, the court may consider the full text of the relevant documents to determine whether the plaintiffs have alleged material misrepresentations or omissions. *See In re Stac Electronics Sec. Litig.,* 89 F.3d 1399, 1405 n. 4 (9th Cir.1996). Such consideration does not convert the motion into one for summary judgment. *See id.* The standard for determining whether the relevant documents contain material misrepresentations or omissions is whether a reasonable investor would have been misled about the nature of his investment in the securities at issue. *See In re VeriFone Sec. Litig.,* 11 F.3d 865, 869 (9th Cir.1993).

## IV. DISCUSSION

### 1. The Relevant Statutes of Limitations

#### a. *Securities Act Claims*

 The statute of limitations governing § 11 and § 12(a)(2) claims is set forth in § 13 of the Securities Act, which requires a complaint to be brought "within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence[.]." 15 U.S.C. § 77m.[6] Thus, the statute of limitations on Securities Act claims is triggered either by "actual notice"—the discovery of the untrue statement or omission—or "inquiry notice"— when discovery should have been made by the exercise of reasonable diligence.

 Inquiry notice may be triggered by "any financial, legal, or other data, such

---

**6.** A complaint may not be brought more than three years after the security was offered to the public or sold. 15 U.S.C. § 77m.

as public disclosures in the media about the financial condition of the corporation and other lawsuits alleging fraud committed by the defendants, that provide the plaintiff with sufficient storm warnings to alert a reasonable person to the probability that there were either misleading statements or significant omissions involved in the sale of securities." *In re Livent, Inc. Sec. Litig.*, 148 F.Supp.2d 331, 364–65 (S.D.N.Y.2001). Inquiry notice may also be triggered by the suspension of trading in the issuer's stock, public reports of federal or state investigations of the registrant, notice that the issuer has filed for reorganization or bankruptcy, a sharp decline in stock value, or public disclosure of the adverse financial condition of the issuer. *In re CBT Group PLC Sec. Litig.*, 2000 WL 33339615 at *6 (N.D.Cal. Dec. 29, 2000). "While any one of these [events] may not be determinative, the cumulative effect of two or more of them may well require that a purchaser of a registered security commence a Section 11 action within one year of these events." *Id.* The triggering information must relate directly to the alleged misrepresentations or omissions upon which the plaintiff relies. *Newman v. Warnaco Group*, 335 F.3d 187, 193 (2d Cir.2003) (quoting *Morin v. Trupin*, 809 F.Supp. 1081, 1097 (S.D.N.Y.1993)).

### b. *Securities Exchange Act Claims*

■ Because private causes of action under § 10(b) of the Securities Exchange Act and Rule 10b–5 promulgated thereunder are judicially created, such actions have no statutorily-specified statute of limitations period. *See Berry v. Valence*

*Technology, Inc.*, 175 F.3d 699, 703 (9th Cir.1999). In *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991), the Supreme Court held that § 10(b) claims are governed by the standard contained in § 9(e) of the Securities Exchange Act. Thus, "[l]itigation instituted pursuant to § 10(b) and Rule 10b–5 must be commenced within one year after the discovery of facts constituting the violation and within three years after such violation." *Id.* at 364, 111 S.Ct. 2773.

■ The Ninth Circuit has declined to decide whether the § 9(e) statute of limitations is triggered by actual discovery or inquiry notice. *See Berry*, 175 F.3d at 703–06. However, every circuit to have decided the issue has held that § 9(e) is triggered by inquiry notice. *See, e.g., Rothman v. Gregor*, 220 F.3d 81, 96 (2d Cir.2000); *Sterlin v. Biomune Sys., Inc.*, 154 F.3d 1191 (10th Cir.1998); *Great Rivers Coop., of S.E. Iowa v. Farmland Industries, Inc.*, 120 F.3d 893, 896–97 (8th Cir.1997); *Ockerman v. May Zima & Co.*, 27 F.3d 1151, 1155 (6th Cir.1994); *Tregenza v. Great Am. Comm. Co.*, 12 F.3d 717, 718 (7th Cir.1993); *Howard v. Haddad*, 962 F.2d 328, 329–30 (4th Cir.1992); *Topalian v. Ehrman*, 954 F.2d 1125, 1134 (5th Cir.1992).[7]

The Ninth Circuit has noted, however, that if it were to follow the unanimous decisions of the other circuits to follow the inquiry notice, it would follow the Tenth Circuit's formulation of the standard as set forth in *Sterlin v. Biomune Sys., Inc.*, 154 F.3d 1191 (10th Cir.1998). In *Sterlin*, the

---

7. Because "[c]ourts can impute knowledge of public information without inquiring into when, or whether, individual shareholders actually knew of the information in public," it is likely irrelevant whether a court employs the actual knowledge or notice inquiry standard. *See Berry*, 175 F.3d at 703 n. 4 (citing *Whirl-*

*pool Fin. Corp. v. GN Holdings, Inc.*, 67 F.3d 605, 610 (7th Cir.1995) ("A reasonable investor is presumed to have information in the public domain, and therefore ... is imputed with constructive knowledge of this information.")).

Tenth Circuit held that the statute of limitations is triggered "once the investor, in the exercise of due diligence, should have discovered the facts underlying the alleged fraud." *Id.* at 1201. *Sterlin* directs courts to focus on two questions: (1) Would the publicly known information have raised sufficient suspicion to cause a reasonable investor to investigate the matter further? and (2) If so, when should a reasonably diligent investor have discovered the facts underlying the allegedly fraudulent activity? *See Berry,* 175 F.3d at 704.

### 2. Conformity with Pleading Requirements of § 13

■ As a threshold matter, Movants correctly observe that with respect to their claims under the Securities Act, Plaintiffs have failed even to adequately plead that they have complied with the statute of limitations. *See Toombs v. Leone,* 777 F.2d 465, 468 (9th Cir.1985) (Section 13 of Securities Act requires plaintiff to "affirmatively plead sufficient facts in his complaint to demonstrate conformity with the statute of limitations.").[8] For that reason alone, Plaintiffs' claims under the Securities Act must be dismissed. Because Section 13 does not apply to Plaintiffs' claims under § 10(b), and because a failure to plead alone might be cured, the court addresses the merits of Movants' argument that Plaintiffs could not, on the undisputed

facts, plead compliance with the applicable statutes of limitations.

### 3. Application of the Statutes of Limitations

The gravamen of the Complaint is that Defendants made various misstatements and omissions concerning the AUCS transaction.[9] In the Prospectus and Registration Statement, and during various roadshow presentations, Defendants purportedly misrepresented Infonet's ability to transition AUCS users to The World Network and its potential to sell additional services to AUCS users. Plaintiffs assert that Defendants misrepresented that the transition of AUCS users would be implemented within 12–18 months, and that its infrastructure would be capable of meeting this time frame. *See, e.g.,* Compl. ¶¶ 7–8, 13–16, 75–78, 160. Finally, Plaintiffs allege that Infonet misrepresented the amount of revenue the AUCS transaction would generate. *See, e.g.,* Compl. ¶¶ 6–8, 21–32, 52, 56, 104–06, 110–11, 114.

■ Movants contend Plaintiffs were on inquiry notice, if not actual notice, of their Securities Act and Securities Exchange Act claims by March 2001 and, in any event, no later than June 2001. *See* Mot. at 16–18. Because Plaintiffs did not sue Movants until July 3, 2002, Movants argue that Plaintiffs' claims are barred as a matter of law.[10] After reviewing the various

---

8. Plaintiffs fail to address this argument.

9. As the court finds Plaintiffs' Securities Act claims to be "grounded in fraud," *see* 8/8/03 Order Granting Infonet, et al.'s Motion to Dismiss at 19–21, the court will examine whether there was sufficient information to place Plaintiffs on inquiry notice for potential fraud with respect to both Plaintiffs' Securities Act and Securities Exchange Act claims.

10. To support this argument, Movants have submitted numerous analysts reports on Infonet, most of which are quoted in the Com-

plaint. Plaintiffs object to two of these reports, a UBS Warburg Report dated March 21, 2001 (Exhibit 19) and a Merrill Lynch Report dated April 17, 2001 (Exhibit 21). Plaintiffs argue that these reports cannot be considered because they were not quoted in the Complaint, and thus are "outside the Complaint." *See* Pls. Opp. to Underwriters' Req. for Jud. Notice at 1. However, a court may take judicial notice of matters of public record outside the complaint without converting a motion to dismiss into a motion for summary judgment. *See MGIC Indemnity Corp. v. Weisman,* 803 F.2d 500, 504 (9th

analysts' reports, it is clear that Plaintiffs had ample "storm warnings" to alert them that the Prospectus potentially contained misstatements regarding the AUCS transaction by the end of 2000, and that by Spring 2001, Plaintiffs were on notice that the plan to migrate AUCS users was a failure. By June 2001, at the very latest, Plaintiffs had actual knowledge that the predictions contained in Infonet's Prospectus were untrue.

Only weeks after the IPO, various analyst reports echoed the same cautionary statements set forth in the Prospectus concerning the risks associated with the AUCS transaction. On January 10, 2000, ABN AMRO issued a report reminding investors that "[i]t is important to note that AUCS is a loss-making venture[.]" Underwriters' RJN, Ex. 1 at 5. It further cautioned that "[t]he multinational corporate clients of KPN, Swisscom, and Telia are not obligated to use Infonet's services. Additionally, clients may not transition to The World Network or purchase the same amount of services previously contracted with AUCS." *Id.* at 9. Similarly, a Lehman Brothers report also issued January 10, 2000 warned investors that "[m]igration of the recently acquired AUCS customer base is in our view the biggest operational challenge for Infonet." Underwriters' RJN, Ex. 2 at 25. Warburg Dillon Read echoed these concerns in its report issued January 13, 2000, stating that the "AUCS customer migration is not a done deal[.]" Underwriters' RJN, Ex. 3 at 37. Noting that the "most lucrative revenue stream from the AUCS transaction is from the AUCS customers that migrate onto the [I]nfonet network," the report warned that "the migration of the 1,300 customers to [I]nfonet's network is not guaranteed." *Id.*

Plaintiffs contend, and the court agrees, that these statements alone do not constitute adequate warnings of the upcoming storm, as the reports' warnings were accompanied by positive statements regarding the potential revenue the AUCS transaction would create. *See* 1/10/00 ABN AMRO Report, Underwriters' RJN, Ex. 1 at 5 ("We believe [the AUCS] transaction has tremendous upside potential for Infonet."); 1/10/00 Lehman Bros. Report, Underwriters' RJN, Ex. 2 at 25 ("[W]e believe the odds are good that Infonet management can migrate [AUCS's] customer base over to the Infonet platform[.]"); 1/13/00 Warburg Dillon Read Report, Underwriters' RJN, Ex. 3 at 46 ("The AUCS contract is a win-win solution for all involved parties.").[11]

By June 2000, however, the analysts' reports had begun to reveal the shortfalls in Infonet's execution of the AUCS transaction, particularly its ability to transition AUCS users and to market additional ser-

---

Cir.1986). Among the public documents a court may consider in a motion to dismiss securities fraud claims are analyst reports when they are submitted to establish "whether and when certain information was provided to the market," not the truth of the matters asserted in the reports. *See In re PetSmart, Inc. Sec. Litig.,* 61 F.Supp.2d 982, 987 n. 1 (D.Ariz.1999). The two reports are comparable in form and content to the numerous reports that Plaintiffs heavily quote in the Complaint. Moreover, Plaintiffs do not dispute the authenticity of the analysts' reports. As Plaintiffs rely heavily on such analysts' reports to state their claims, they "can hardly complain when [Movants] refer to the same information in their defense." *In re Silicon Graphics Inc. Sec. Litig.,* 183 F.3d 970, 986 (9th Cir.1999).

**11.** These positive statements regarding he AUCS transaction are in stark contrast to those of a year later when it was evident that the AUCS transaction had failed. *See* discussion *infra* at 1118. While analysts continued to recommend Infonet stock, it was despite Infonet's failure to realize the expected revenue from AUCS.

vices to the AUCS users. In a report dated June 6, 2000, Lehman Brothers noted that it "believed the planned migration of the AUC[S] customer base is behind schedule, and holds $40M of revenue risk to FY01." Underwriters' RJN, Ex. 5 at 96. Lehman Brothers also noted that the training of employees to sell and support Infonet's product offering was two to four months behind schedule, further negatively impacting the amount of revenue Infonet could expect from AUCS. *Id.* at 97. On June 12, 2000, Lehman Brothers expanded its critique of Infonet's progress regarding AUCS, stating that it believed Infonet management's AUCS revenue projections were "aggressive" and "not achievable," and warned investors to "maintain lowered expectations" regarding the amount of revenue to be derived from the AUCS transaction. Underwriters' RJN, Ex. 6 at 101.[12]

On June 27, 2000, Lehman Brothers issued another report, repeating the view that Infonet's revenue projection regarding the AUCS business was "aggressive," because it was "dependent on a migration process which [was] behind schedule." Underwriters' RJN, Ex. 8 at 105. Lehman Brothers warned investors that the AUCS revenue stream was "the most uncertain of [Infonet's] revenue components [due to the] lack of visibility around the timing of bringing these 1000 + customers onto the Infonet World Network and platform." *Id.* at 106. The report noted that this uncertainty was also due to Infonet's delay in the sales force training process. *See id.* at 107.[13] Lehman Brothers noted that "it looks to us like more [AUCS]

customers are expected to stay on the AUCS[S] platform, and while [Infonet] will be able to sell new services (i.e. remote access), this implies the revenue and EBITDA expectations ... may have downside from current levels." *Id.* This negative news was absorbed by the market, decreasing the value of Infonet's stock to roughly $12 as of June 27, 2000, a decrease of almost 50% from its price at the time of the IPO. *See* Underwriters' RJN, Ex. 23 at 191.

The news regarding Infonet's progress with AUCS further soured as 2000 progressed. By August 2000, the AUCS project had been declared a "false start," and Infonet's revenue projections had been declared "overly optimistic." 8/8/00 Lehman Brothers Report, Underwriters' RJN, Ex. 11 at 132. Lehman Brothers stated that "AUCS must ... show some growth, contrary to what we believe is a declining trend for this segment." *Id.* at 133. In October 2000, ABN AMRO removed Infonet's stock from its Top Pick list. *See* Underwriters' RJN, Ex. 12 at 135–36. In November 2000, Lehman Brothers stated that growth in the AUCS business "remains a question mark for the year[.]" 11/7/00 Lehman Brothers Report, Underwriters' RJN, Ex. 14 at 141. In December 2000, Merrill Lynch reported that it was "disappointed by the new revenue indications for the year reflecting the difficulties in generating significant momentum at AUCS ... in the short term[.]" 12/13/00 Merrill Lynch Report, Underwriters' RJN, Ex. 15 at 144.

---

**12.** In a report dated June 14, 2000, Merrill Lynch echoed Lehman Brothers' negative comments regarding Infonet's progress with AUCS. Merrill Lynch stated that "[g]rowth in revenues at AUCS was described as sluggish[.]" Underwriters' RJN, Ex. 7 at 103.

**13.** In a report dated July 7, 2000, UBS Warburg Dillon also attributed Infonet's slow progress with AUCS to delays in training the sales force. *See* Underwriters' RJN, Ex. 9 at 114 ("The transitioning of AUCS customers to [I]nfonet products has been slow due to delays in training the AUCS sales forces on [I]nfonet products.").

As of December 31, 2000, Infonet's stock price closed at $5.00, a loss of 75% in just over a year. *See* Underwriters' RJN, Ex. 23 at 187. Although the decrease in stock price alone is insufficient to trigger inquiry notice, *see, e.g., In re Ames Dept. Stores, Inc. Note Litig.*, 991 F.2d 968, 981 (2d Cir.1993), such a drastic decrease in the value of Infonet's stock, taken together with the nearly universal negative reports concerning AUCS, should have "raise[d] sufficient suspicion of fraud to cause a reasonable investor to investigate the matter further." *Berry*, 175 F.3d at 704.

By early 2001, more than a year after the IPO, the market was well aware that Infonet had fallen far short of the revenue it had expected to obtain from the AUCS transaction, and was failing in its plan to transition AUCS's multinational clients within the 12–18 month period set forth in the Prospectus. In January 2001, UBS Warburg informed investors that it had "concern[s] that the AUCS customers are tending to stay with AUCS products, rather than moving over to [I]nfonet products." 1/26/01 UBS Warburg Report, Underwriters' RJN, Ex. 16 at 151. In a report dated February 6, 2001, Lehman Brothers informed investors that "[g]iven the performance of AUC[S] thus far for Infonet, this remains the biggest risk to the story. Whereas the plan at the time of the IPO was to migrate the customers/contracts on the AUC[S] platform to the Infonet platform over time, [Lehman Brothers] believe[s] that the plan has been adjusted so as not to disrupt the customers on the AUC[S] platform, and essentially link the AUC[S] platform to the Infonet platform. More importantly, a key part of the growth from AUC[S] was expected to come from selling incremental contracts/services into this customer base. This is the part that has slipped, . . . and we believe that progress here continues slowly." Underwriters' RJN, Ex. 18 at 161–62.

By March 2001, the message was clear: Infonet had not reaped the benefits of the AUCS transaction, as it had "not [gone] quite as planned." 3/21/01 UBS Warburg Report, Underwriters' RJN, Ex. 19 at 163. By this point, it was evident that "[a]lthough AUCS customers are not leaving AUCS, they are also not moving over to [I]nfonet." *Id.* Lehman Brothers was equally unambiguous in its review of Infonet's lack of progress with AUCS, informing investors that "[i]t is clear now that [AUCS is] not providing growth that was expected, and [with] the stock off 75%–80% in the past year, it is likely factored into the valuation." 3/21/01 Lehman Brothers Report, Underwriters' RJN, Ex. 20 at 164. Lehman explained that AUCS had been a source of problems since Infonet's IPO, explaining that "it hasn't been a smooth road [for Infonet], as the ramp in its AUC[S] acquisition has been slower than expected, causing weakness relative to expectations, as we highlighted 9 months ago." *Id.* On April 17, 2001, Merrill Lynch unequivocally stated that it believed that "the lower revenue expectations result from not only the slower than anticipated growth from SBC and DT[,] but also from *the poor growth in customers and average revenues at AUCS in relation to initial expectations* [.]" 4/17/01 Merrill Lynch Report, Underwriters' RJN, Ex. 21 at 173 (emphasis added). By Spring 2001, investors were on notice that Infonet could not meet the predictions with respect to AUCS as set forth in the Prospectus.

 If Plaintiffs were on notice by Spring 2001 of the disappointing progress of the AUCS transaction, by June 2001, they had actual knowledge that the Prospectus' projections regarding the transition of AUCS users to Infonet had failed to

materialize. Indeed, by June 2001, an exercise in simple math would have alerted any investor that the Prospectus's prediction of a 12 to 18–month transition period for AUCS users to The World Network was demonstrably untrue. "[D]ramatic discrepancies between the very precise projections made by defendants and the actual results, ... [can be] sufficient to give ... inquiry notice which start[s] the limitations clock.... This is not to say that the discrepancies prov[e] fraud, but simply that a reasonable investor would have believed that fraud was a possible explanation." *Whirlpool Financial Corp. v. GN Holdings, Inc.*, 67 F.3d 605, 610 (7th Cir.1995). By June 2001, 18 months had elapsed, and Infonet had manifestly failed in its goal of transitioning AUCS users. If the analysts' reports had not made it clear earlier, no reasonable investor could, as of June 2001, claim ignorance of this fact. Thus, at the very latest, the statute of limitations clock began to run in June 2001. *See Sterlin*, 154 F.3d at 1201 ("[T]he one-year statute of limitations period begins to run once the investor, in the exercise of due diligence, should have discovered the facts underlying the alleged fraud.").

Plaintiffs contend, however, that the statute of limitations could not have been triggered earlier than July 31, 2001, when more negative news concerning the AUCS business was revealed, namely, Infonet's inability to invoice AUCS users monthly. *See* Opp. at 9–10; Compl. ¶ 123 (Defendant Collazo admitted that "it is just now that we've been able to get [AUCS] customers to bill on a monthly basis," and that they were not able to accurately collect various data because "[AUCS] sys-

tems don't give [us] a lot of visibility."). Prior to this disclosure, however, there was a stream of negative information available to the public "of substantial substance" about Infonet's failure with AUCS, which should have "excite[d] inquiry," triggering an investor's duty of reasonable diligence. *See Cook v. Avien*, 573 F.2d 685, 697 n. 25 (1st Cir.1978) (internal quotations omitted).

██ That Infonet disclosed additional negative news regarding AUCS after June 2001 is not surprising, as additional disappointing news would be expected in the context of a faltering business. Plaintiffs essentially pick a disclosure within the statute of limitations period, and urge the court to ignore the drumbeat of negative news about AUCS that had started over a year before the filing of the instant action, and been accompanied by a startling drop in Infonet's stock's value. Rewarding such ignorance would defeat the primary purpose of the securities laws, *viz.*, "to protect the innocent investor, not the one who loses his innocence and then waits to see how his investment turns out before he decides to invoke the provisions of the [securities laws]." *Volk v. D.A. Davidson & Co.*, 816 F.2d 1406, 1413 (9th Cir.1987) (quoting *Stull v. Bayard*, 561 F.2d 429, 433 n. 4 (2d Cir.1977), *cert. denied*, 434 U.S. 1035, 98 S.Ct. 769, 54 L.Ed.2d 783 (1978)). Plaintiffs "need not ... have fully discovered the nature and extent of the fraud before [they were] on notice that something may have been amiss. Inquiry notice is triggered by evidence of the possibility of fraud, not full exposition of the scam itself." *Sterlin*, 154 F.3d at 1203 (internal quotations omitted).[14] Infonet's

---

14. Citing *Berry*, Plaintiffs mistakenly assert that inquiry notice could not be triggered unless the reports included an "allegation of actual fraud" on the part of Defendants. *See* Opp. at 6. There, the Ninth Circuit held that

"[w]hile an investor *need not have full knowledge of fraud* in order reasonably to be expected to investigate worrisome allegations concerning his investments, he will not be presumed to have done so unless the allega-

disclosure in July 2001 was merely cumulative of a steady stream of negative information concerning AUCS.

Moreover, Infonet's poor visibility of AUCS's users was not "new" information. As stated in the portion of the report quoted in the Complaint, Lehman Brothers noted that this information "reignite[d]" concerns over Infonet's "lack of internal visibility," *see* Compl. ¶ 124, an issue *previously discussed in various reports. See, e.g.,* 6/12/00 Lehman Brothers Report, Underwriters' RJN, Ex. 6 at 101 ("In our [6/6/00] note, we also attempted to quantify the relationship between the number of customers migrated from the AUC[S] platform to the [Infonet] platform, but admit that it is based on a number of assumptions. . . . [W]e are not totally convinced that the AUC[S] revenue base is not [sic] without incremental revenue risk, pending greater visibility.").

Finally, Plaintiffs argue that they were not on notice because most of the analysts' reports cited by Movants gave Infonet "buy" recommendations. *See* Opp. at 6–7. Plaintiffs' argument is unpersuasive, because the analysts' recommendations had nothing to do with AUCS, but rather relied on other aspects of Infonet's business. For instance, in a report dated June 12, 2000, Lehman Brothers explained that it thought Infonet's stock was a wise long-term investment after factoring in all its sources of revenue. *See* 6/12/00 Lehman Brothers Report, Underwriters' RJN, Ex. 6 at 102 ("*Factoring in all the sources of* growth, we believe that [Infonet's] long term consolidated growth outlook is in

good shape *despite the likely underperformance of AUC[S],* as it is just one of four drivers [of revenue].") (emphasis added). Similarly, on April 17, 2001, Merrill Lynch reported that although Infonet's decline in revenue projections, due in part to the failure of the AUCS business, was "disappointing," it believed that the stock price did not "fully reflect the strong EBITDA progression and strategic value of the business[.]" 4/17/01 Merrill Lynch Report, Underwriters' RJN, Ex. 21 at 173–74.

It is of no consequence that analysts' reports continued to give Infonet's stock positive recommendations, as the analysts' reports unequivocally expressed Infonet's failure to meet its goals with regard to AUCS, the very issue upon which Plaintiffs' claims rely. *See Newman,* 335 F.3d 187, 193 (2d Cir.2003) (triggering information must relate directly to alleged misrepresentations or omissions upon which plaintiff relies). By Spring 2001, the analysts' reports had unequivocally declared the AUCS relationship a failure. By June 2001, 18 months had elapsed and Infonet had not transitioned a significant number of AUCS users. Therefore, by Spring 2001, and no later than June 2001, Plaintiffs were on notice concerning any claims based on Infonet's representations regarding AUCS in the Prospectus and Registration Statement. Because Plaintiffs did not sue the Underwriters and Foreign Telecoms until July 3, 2003, Plaintiffs' Securities Act and Securities Exchange Act claims against these Defendants are barred as a matter of law.[15] Accordingly,

---

tions are sufficient to 'excite inquiry' into the possibility of fraudulent conduct." *Berry,* 175 F.3d at 705. *Berry* does *not* require a public allegation of fraud to trigger the statute of limitations.

**15.** Plaintiffs cannot contend that their claims against the Underwriters and Foreign Telecoms "relate back" to the original complaint

filed December 5, 2001 under Rule 15(c)(3), given that the Underwriters and Foreign Telecoms were listed on the Prospectus and Registration Statement. *See* Fed.R.Civ.P. 15(c)(3); *In re Stac Electronics,* 89 F.3d at 1411 (when defendants added in amended complaint were named in Prospectus, but not named in original complaint, plaintiffs cannot

the court **GRANTS** *with prejudice* the Underwriters' and Foreign Telecoms' motions to dismiss.

## V. CONCLUSION

For the foregoing reasons, the court GRANTS *with prejudice* Defendants Merrill Lynch & Co., Inc., UBS Warburg LLC, ABN AMRO, Goldman, Sachs & Co., Lehman Brothers, and Salomon Smith Barney Inc.'s motion to dismiss. For the same reasons, the court GRANTS *with prejudice* Defendants KDDI Corporation, KPN Telecom, Swisscom AG, Telefonica International Holding B.V., Telia AB, and Telstra Corporation's motion to dismiss.

IT IS SO ORDERED.

rely on date they first filed the complaint for statute of limitations purposes).